[No. D044546. Fourth Dist., Div. One. Sept. 25, 2006.]

RED MOUNTAIN, LLC, Plaintiff, Cross-defendant and Respondent, v. FALLBROOK PUBLIC UTILITY DISTRICT, Defendant, Cross-complainant and Appellant.

FALLBROOK PUBLIC UTILITY DISTRICT, Plaintiff and Appellant, v. RED MOUNTAIN, LLC, Defendant and Respondent.

## Counsel

Best, Best & Krieger, Bruce W. Beach, Shawn Hagerty; Sachse, James & Lopardo and Stephen V. Lopardo for Defendant and Appellant.

Asaro, Keagy, Freeland & McKinley, Richard R. Freeland, Steven A. McKinley and Charles F. Campbell, Jr., for Plaintiff and Respondent.

## Opinion

**AARON, J.**—Red Mountain, LLC (Red Mountain), owns undeveloped land adjacent to a drinking water reservoir (the reservoir) and surrounding property owned by Fallbrook Public Utilities District (Fallbrook). Red Mountain sued Fallbrook for breach of contract, specific performance, and inverse condemnation based on Fallbrook's refusal to perform a written agreement to convey to Red Mountain a 60-foot easement for ingress and egress (the access easement) across Fallbrook's property. Fallbrook filed a cross-complaint to quiet title and for declaratory and injunctive relief, in which it alleged that approximately 127 acres of Red Mountain's property was encumbered by a nonexclusive "sanitary easement" (the sanitary easement), which entitled Fallbrook "to patrol, control and maintain sanitary conditions" in the easement area in order to keep the reservoir water free from contamination. Fallbrook alleged that the easement precluded Red Mountain from developing the land within the easement area.

While this litigation was pending, Fallbrook filed an eminent domain complaint against Red Mountain condemning a 134.24-acre parcel of land that included all or most of the sanitary easement area.[1] Fallbrook also condemned any and all rights Red Mountain might have had to the 60-foot access easement. The two actions were consolidated and, following a bifurcated trial, the trial court entered judgment pursuant to a jury verdict that awarded Red Mountain damages of $1,464,928 for breach of contract and inverse condemnation, and compensation of $872,560 for the direct taking in eminent domain. After it entered judgment, the trial court awarded Red Mountain attorney fees and other litigation expenses under Code of Civil Procedure sections 1036 and 1250.410.

Fallbrook appeals from the judgment, contending that the trial court committed reversible error by (1) failing to construe the access easement in a manner consistent with the undisputed evidence, and with Civil Code section 1069; (2) relocating the access easement and failing to limit the scope of the easement to Red Mountain's personal ingress and egress; (3) failing to interpret the scope of the sanitary easement pursuant to Fallbrook's declaratory relief cause of action; (4) determining that Fallbrook was liable for inverse condemnation; (5) admitting evidence of speculative damages; (6) incorrectly instructing the jury and refusing certain jury instructions that Fallbrook requested; (7) refusing Fallbrook's request to include questions regarding Fallbrook's contract defense of impossibility or impracticability of performance in the special verdict form, and failing to ensure that the verdict form protected against duplicative damages; and (8) awarding Red Mountain attorney fees and litigation expenses under Code of Civil Procedure section 1250.410. We reverse the judgment and the order awarding litigation expenses.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1949, Frank and Lucille Capra sold 53 acres of land to Fallbrook to be used for the construction of a dam and reservoir. The contract between Fallbrook and the Capras (the 1949 agreement) included the following provision creating the sanitary easement: "[The Capras] also grant to [Fallbrook] a non-exclusive easement over the area of the water-shed lying back of the dam to be constructed by [Fallbrook], which area consists of approximately 127 acres, for the purpose of enabling [Fallbrook] to patrol, control and maintain sanitary conditions thereon necessary and adequate to keep the water stored in [the] reservoir pure, wholesome, potable and free

---

[1] It is not clear from the record, including the eminent domain complaint, whether the 134.24 acres that Fallbrook directly condemned includes the entire 127-acre area of the sanitary easement. However, Fallbrook makes a representation to that effect in its opening brief.

from contamination from [the] surrounding water-shed area and to enable [Fallbrook] at all times to comply with the Public Health Laws of the State of California and the rules and regulations of the State Board of Public Health; it being agreed that nothing herein contained shall be deemed to prevent [the Capras] having free and ready access to [the] 127 acres."

In 1977, the Capras sold approximately 710 acres of land adjacent to the reservoir to a group of buyers consisting of James Walter Chaffin and his wife Nola Belle Chaffin, John Roy Chaffin and his wife Mary Lee Chaffin, and Dr. Frederick E. Jackson and his wife Margaret J. Jackson (the Chaffin/Jackson group). The Chaffin/Jackson group immediately transferred approximately 109 of those acres to another group of buyers and planned to develop the remaining land (the Red Mountain Ranch property) into homesites.

In February 1978, Fallbrook notified James Chaffin by letter that it required approximately 18 acres of additional land north of the reservoir for future water storage and treatment. Fallbrook offered to purchase the land for $3,500 per acre "excluding reserved road easement areas[,]" and proposed that the "[o]wner may reserve a 50 foot easement on [the] east and west boundaries of the parcel." The Chaffin/Jackson group proposed certain conditions to its sale of the 18-acre parcel, one of which was that Fallbrook agree "to grant seller a 60-foot easement over the existing road on the west sides [*sic*] of the parcel being conveyed . . . ." Another was that the 60-foot easement "be sufficient in scope and magnitude to meet the subdivision requirements of San Diego County and will be granted to sellers or their successors in interest upon 90 days notice at any future time."

At a meeting of Fallbrook's board of directors on August 14, 1978, which James Chaffin, Dr. Jackson and their attorney attended, the board approved most of the conditions the Chaffin/Jackson group had proposed. However, the board voted to delete the condition that the access easement "be sufficient in scope and magnitude to meet the subdivision requirements of San Diego County." James Chaffin and Dr. Jackson agreed to the terms that the board approved.

On August 30, 1978, the parties signed escrow instructions setting forth the terms of their agreement (the 1978 agreement). With respect to the access easement, the escrow instructions stated: "[Fallbrook] [a]grees to grant at any future time the following easements to the sellers or their successors in interest upon provision to [Fallbrook] by the sellers, or their successors in interest, 90 days notice, legal descriptions and documentation required to accomplish said granting: a 60 foot easement over the existing road on the

West sides [*sic*] of the parcel being conveyed and the present [Fallbrook] property described in [its 1949 grant deed] . . . ."[2]

In October 1978, James Chaffin and Dr. Jackson died in an airplane crash. The Chaffin family later acquired the Jacksons' interest in the Red Mountain Ranch property. After James Chaffin's estate was settled, one-third interests in the property were held, respectively, by Nola Belle Chaffin, her six children, and John Roy and Mary Lee Chaffin (collectively the Chaffins). The Chaffins abandoned plans to develop the property sometime after James Chaffin's death, in part because San Diego County designated the Red Mountain Ranch property as a possible site for a landfill in the early 1980's.

In 1981, Fallbrook notified the Chaffins that it was planning to expand the reservoir, and that the expansion project would require it to excavate a portion of the Red Mountain Ranch property. Fallbrook proposed a boundary adjustment to accommodate the project, and offered to place excess fill material removed from the project into two canyons on the Red Mountain Ranch property "to enhance development of that portion of [the] property." The Chaffins ultimately agreed to sell 3.31 acres of land to Fallbrook to be used for the reservoir expansion project.

Construction on the reservoir expansion project began in mid-1983 and was completed in late 1985. The expanded reservoir obliterated approximately 1,000 feet of the road that had run along the west side of the reservoir, placing that portion of the road under a dam and up to 90 feet of water. Fallbrook built a paved road along the west side of the expanded reservoir (Red Mountain Dam Road) to replace the portion of the old road that had been destroyed. At its closest point to the reservoir, the new road is separated from the reservoir by a six-inch berm. Vehicles traveling at that point on the road are 30 to 40 feet from the reservoir water, depending on the water level. Fallbrook installed a gate across the new road, but provided keys to the lock on the gate to the Chaffins so they could use the road to access the Red Mountain Ranch property.

In the late 1990's the Chaffins learned that the Red Mountain Ranch property was no longer being considered as a possible landfill site. In 1999, James Chaffin, Jr. (Chaffin), with the approval of the other property owners, decided to pursue a subdivision project on the property. The Chaffins formed Red Mountain for that purpose and transferred all of their interests in the property to Red Mountain.

---

[2] The existing access easement road referenced in the 1978 agreement ran north from Mission Road along the west side of the reservoir into the Red Mountain Ranch property. Mission Road is the main road that runs east-west through the city of Fallbrook.

Chaffin hired civil engineer Gary Piro to act as project engineer. Piro's initial subdivision design showed access to the subdivision from Mission Road along Red Mountain Dam Road. In early 2000, Fallbrook objected to the use of Red Mountain Dam Road for access to a subdivision. Fallbrook's chief engineer told Chaffin and Piro that use of the road for a subdivision would cause Fallbrook to have to cover the reservoir.

Because of Fallbrook's objection to Red Mountain's proposed use of Red Mountain Dam Road, Chaffin attempted to find a different way to access the subdivision. He negotiated with an owner of property that fronted Mission Road on the east side of the reservoir for an access easement that would serve all of the Red Mountain Ranch property north of Mission Road. However, those negotiations were ultimately unsuccessful.

In August 2000, Red Mountain notified Fallbrook that, pursuant to the 1978 agreement, it would provide the documents necessary for Fallbrook to grant Red Mountain a 60-foot easement over Red Mountain Dam Road. Fallbrook responded with a letter in which it stated that it would not grant the access easement. Fallbrook explained that "[t]he increased traffic would require [the reservoir] to be covered due to health constraints" at a cost of "several million dollars, which [Fallbrook] has not budgeted and for which [it] would not be inclined to raise rates." Fallbrook added: "As a practical matter, the 'existing roads' referred to in the [1978 agreement] no longer exist. Those roads were inundated by the enlargement of [the reservoir] in 1983. That project was legally noticed throughout the Fallbrook community and the District received no complaints or requests for reservation of any roadway. Further, [the subdivision development] proposed now was not anticipated for the Chaffin Ranch use in 1978."

In June 2001, Red Mountain filed a complaint against Fallbrook for breach of contract, specific performance and inverse condemnation, based on Fallbrook's refusal to grant the access easement. Fallbrook answered the complaint and in April 2002 filed a cross-complaint to quiet title and for declaratory and injunctive relief. In its cross-complaint, Fallbrook asked the trial court to rule that the sanitary easement was valid and that it precluded Red Mountain's proposed subdivision development. In September 2002, Fallbrook filed an eminent domain complaint against Red Mountain, condemning 134.24 acres that included the 127 acres of the sanitary easement. Fallbrook's complaint also condemned any and all rights Red Mountain had to the access easement.

On the parties' stipulation, the trial court consolidated the two actions for trial and Fallbrook moved to bifurcate the trial into liability and compensation phases. In opposition to the motion, Red Mountain argued that the

proposed bifurcation would violate its right to a jury trial on its breach of contract claim. The court granted the motion, ruling that the court would try liability issues, and the jury would decide the amount of compensation. However, at oral argument on the motion, the trial court stated that if "surviving issues of fact will necessarily have to go to the jury [after the first phase of trial], I will . . . fashion . . . an order that provides for that."

After the liability phase of the trial was completed, the trial court issued a statement of decision in which it ruled that: (1) the access easement referenced in the 1978 agreement granted Red Mountain a 60-foot easement over Red Mountain Dam Road; (2) Red Mountain Dam Road was for Red Mountain's ingress to and egress from its "northern property . . . appurtenant to [Fallbrook's] reservoir property[;]" (3) Red Mountain was bound by the language in the 1949 agreement creating the sanitary easement; and (4) "issues addressing whether the proposed 'development' constitutes a new burden on [the sanitary] easement, whether inverse or pre-condemnation, eminent domain remedies, possible contamination of the sanitation easement, and the likelihood that the development will overburden this easement, are all premature." On November 13, 2003, the court filed an interlocutory judgment on bifurcated issues, in which it set forth its rulings in the statement of decision.

On December 1, 2003, Fallbrook made a "final offer" of $900,000 "to resolve all issues of compensation both as to the direct condemnation and claim of inverse condemnation . . . ." On the same day, Red Mountain made a "final demand" of $1,858,000, representing "compensation to be awarded in this proceeding for the taking, both by eminent domain and inverse condemnation, of all real property and interests in real property."

The compensation issues were tried to a jury in February and March of 2004. At the close of evidence, the court made a finding of inverse condemnation, stating, "It will be a jury determination as to whether there are damages."[3] The jury returned a special verdict awarding Red Mountain damages of $1,464,928 on its inverse condemnation and breach of contract causes of action, and $872,560 as the fair market value on February 1, 2004, of the property Fallbrook directly condemned.

---

[3] The trial court did not specify the property it found to have been inversely condemned. However, based on its finding of inverse condemnation, the trial court later instructed the jury as follows: "The court has determined that [Fallbrook] is liable to the Chaffins for the taking of their contractual right to the conveyance of an easement. You are to determine the amount of compensation payable to the Chaffins for this taking. [¶] The amount of compensation is to include the diminution, if any, in the value of the Chaffins' property that would have been served by the easement, caused by the loss of the easement. . . . [¶] The amount of compensation also includes the amount of consulting fees and expenses, if any, that you find were proximately caused by the taking."

After the court entered its final judgment on April 14, 2004, Red Mountain filed a motion for an award of litigation expenses under Code of Civil Procedure section 1036 (applicable to inverse condemnation actions) "and/or" Code of Civil Procedure section 1250.410 (applicable to eminent domain actions). Red Mountain also filed a motion for an order requiring Fallbrook to deposit the full amount of the judgment with the court. On July 16, the court granted both motions and ordered Fallbrook "to make the required deposit in the full amount of the condemnation award . . . ."

On June 10, 2004, Fallbrook timely filed a notice of appeal from the judgment, and on August 13 filed a petition for writ of supersedeas asking this court to stay the order requiring it to deposit the full amount of the condemnation award. On August 25 Fallbrook filed an amended notice of appeal, stating that it was "amend[ing] its notice of appeal filed June 10, 2004, to include the court's ruling on litigation expenses of July 16, 2004 to be included as an issue on appeal." This court granted the petition for writ of supersedeas and issued an order stating: "To the extent that the trial court's . . . order directing deposit of the 'full amount of the compensation award' includes the $1,464,928 award issued for inverse condemnation or breach of contract in connection with the 60 foot easement, the order is stayed pending appeal."

## DISCUSSION

### I. *Sufficiency of Fallbrook's Opening Brief and Notice of Appeal from the Postjudgment Order Awarding Litigation Expenses*

Red Mountain asks this court, on our own motion, to strike Fallbrook's opening brief and dismiss the appeal because the brief does not include a statement of appealability, as required by California Rules of Court,[4] rule 14(a)(2)(B). We exercise our discretion under rule 14(e)(2)(C) to disregard Fallbrook's technical noncompliance with the requirement that its opening brief include a statement of appealability, because the judgment and postjudgment order Fallbrook challenges are both clearly appealable.

Red Mountain also contends that the amended notice of appeal Fallbrook filed on August 25, 2004, either *relates back* to the date of the original notice of appeal filed on April 14, 2004, and, therefore, is a nullity because it is premature as to the July 16, 2004 postjudgment order, or *supersedes* the original notice of appeal from the judgment and, therefore, is untimely as to the judgment. Red Mountain argues that this court should either dismiss the

---

[4] All further rule references are to the California Rules of Court.

appeal from the postjudgment order, or dismiss the entire appeal on the ground that it is untimely.[5] Red Mountain's argument implies that when an appeal is taken from a judgment, an "amended notice of appeal" filed after the time to appeal the judgment has expired is ineffective to appeal a postjudgment order, even if the amended notice of appeal identifies the postjudgment order and communicates the intent to appeal that order.

We reject Red Mountain's analysis, which places far too much significance on Fallbrook's use of the word "amended" in its second notice of appeal. A notice of appeal is to be liberally construed in favor of its sufficiency (rule 1(a)(2)), and it may be deemed sufficient if it has not misled or prejudiced the respondent. (*ECC Construction, Inc. v. Oak Park Calabasas Homeowners Assn.* (2004) 122 Cal.App.4th 994, 1003, fn. 5 [19 Cal.Rptr.3d 340].) As noted, Fallbrook's amended notice of appeal states: "[Fallbrook] hereby amends its notice of appeal filed June 10, 2004, to include the court's ruling on litigation expenses of July 16, 2004 to be included as an issue on appeal." Even conservatively construed, the amended notice of appeal suffi-ciently perfects Fallbrook's appeal from the July 16, 2004 postjudgment order awarding litigation expenses, as it expressly identifies that order as "an issue on appeal." Red Mountain does not, and cannot reasonably, contend that it was misled or prejudiced as to Fallbrook's intent to appeal that order. We deny Red Mountain's request to dismiss Fallbrook's appeal in whole or in part.

## II. *Construction of the Access Easement*

Fallbrook contends that the trial court's interpretation of the access ease-ment referenced in the 1978 agreement as being for subdivision use was erroneous because (1) uncontradicted parol evidence established that the parties intended the easement to be limited to the Chaffins' personal ingress and egress, and (2) the court was required to construe the easement in Fallbrook's favor under Civil Code section 1069 (hereinafter, section 1069). We agree with Fallbrook's second contention.

Section 1069 provides: "A grant is to be interpreted in favor of the grantee, except that a reservation in any grant, and *every* grant by a public officer or body, as such, to a private party, is to be interpreted in favor of the grantor." (Italics added.) Section 1069's directive that every grant by a public body is to be interpreted in favor of the grantor applies only if there is an ambiguity in a grant. (*City of Los Angeles v. Howard* (1966) 244 Cal.App.2d 538, 545 [53 Cal.Rptr. 274].) Here, the parties agree that the 1978 agreement

---

[5] Red Mountain concedes that the postjudgment order awarding litigation expenses is appealable under Code of Civil Procedure section 904.1, subdivision (a)(2).

to grant the access easement is ambiguous as to the scope of the easement. Although the ambiguity is in an *agreement* by a public entity to grant an easement, and not in an actual grant, we conclude that it is appropriate to apply section 1069 in construing the agreement because the ambiguity concerns the nature and scope of the easement to be granted.[6]

Fallbrook argues that because it is a public body, section 1069 mandates that the ambiguity in the 1978 agreement regarding the scope of the access easement be resolved in its favor—i.e., the easement provision must be construed as requiring Fallbrook to grant an easement for personal ingress and egress only. Red Mountain essentially argues that section 1069 does not require a court to automatically interpret an ambiguity in a grant by a public entity in the public entity's favor because, as a general rule, *all* of the rules of construction should be considered in interpreting a contract, and the true intent of the parties should govern the interpretation. (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238 [52 Cal.Rptr.2d 82, 914 P.2d 160].)

We have found no citable California case that directly addresses whether section 1069 requires a court to interpret an ambiguous grant by a public body in favor of the grantor when other rules of construction or extrinsic evidence support an interpretation in favor of the grantee. However, cases that have addressed the role of section 1069 in the construction of ambiguous public grants have viewed the statute's public grant provision as a statutory mandate that takes precedence over other rules of construction.

The rule that ambiguous grants by the government are to be strictly construed in favor of the government is long-standing and well settled. In 1832 the United States Supreme Court noted that "[p]ublic grants convey nothing by implication; they are construed strictly in favour of the king; [citations]." (*United States v. Arredondo* (1832) 31 U.S. 691, 738 [8 L.Ed. 547].) A key aspect of the rule, expressed in a number of later United States Supreme Court opinions, is that "*nothing passes by the [governmental] grant but that which is necessarily and expressly embraced in its terms.*" (*Kean v. Calumet Canal Co.* (1903) 190 U.S. 452, 498–499 [47 L.Ed. 1134, 23 S.Ct. 651] (dis. opn. of White, J.), italics added; see additional cases cited in *Home on the Range v. AT&T Corp.* (S.D.Ind. 2005) 386 F.Supp.2d 999, 1021.)

---

[6] In its statement of decision, the trial court noted the provisions in section 1069 that an ambiguity in a grant is interpreted in favor of the grantee and that an ambiguity in a reservation is interpreted in favor of the grantor. However, the court did not mention the provision in section 1069 that "every grant by a public officer or body, as such, to a private party, is to be interpreted in favor of the grantor." That provision is critical to the resolution of this case, as the 1978 agreement involved an anticipated grant by Fallbrook, a public entity.

More than 100 years ago, the California Supreme Court noted: "[O]ur own legislature has made it statute law that 'every grant by a public officer or body, as such, to a private party, is to be interpreted in favor of the grantor.' ([Civ. Code, §] 1069.) It is certain moreover, that the principle of construction sustained by the weight of recent authority is that . . . '. . . the state is entitled to the benefit of certain well-settled canons of construction that pertain to grants by the state to private persons or corporations, as, for instance, that if there is any ambiguity or uncertainty in the act, that interpretation *must* be put upon it which is most favorable to the state . . . .' " (*Oakland v. Oakland Water Front Co.* (1897) 118 Cal. 160, 175 [50 P. 277], quoting *Illinois Central Railroad Co. v. Illinois* (1892) 146 U.S. 387, 468 [36 L.Ed. 1018, 13 S.Ct. 110], dis. opn. of Shiras, J., italics added.) The California Supreme Court later approved the following iteration of the rule: " ' "All grants of the Crown are to be strictly construed against the grantee, contrary to the usual policy of the law in the consideration of grants; and upon this just ground, that the prerogatives and rights and emoluments of the Crown being conferred upon it for great purposes, and for the public use, it shall not be intended that such prerogatives, rights and emoluments are diminished by any grant, beyond what such grant *by necessary and unavoidable construction* shall take away." ' " (*Los Angeles v. San Pedro etc. R. R. Co.* (1920) 182 Cal. 652, 655–656 [189 P. 449], quoting *Shively v. Bowlby* (1894) 152 U.S. 1, 10 [38 L.Ed. 331, 14 S.Ct. 548], italics added.)

In *County of L. A. v. Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 384 [196 P.2d 773], the California Supreme Court noted that under section 1069, a statutory grant to telegraph and telephone companies of the privilege to construct telegraph or telephone lines along or on public roads "*must* be construed in favor of the state." (Italics added; see also *Southern Cal. Gas Co. v. City of L. A.* (1958) 50 Cal.2d 713, 719–720 [329 P.2d 289] [as a public grant, a franchise granted to a public utility for the use of streets is to be construed in favor of the public interest].)

*Pariani v. State of California* (1980) 105 Cal.App.3d 923 [164 Cal.Rptr. 683] involved a dispute over whether a reservation of mineral rights in a land grant by the state reserved to the state the geothermal resources underlying the granted lands. Noting the federal rule that grants by the federal government are to be construed in the government's favor, the appellate court added that under section 1069, "any doubt concerning the scope of the State's reservation *must* be resolved in favor of the State." (105 Cal.App.3d at p. 932, italics added.)

■ These cases support the proposition that any ambiguity in a grant by a public entity to a private party *must* be construed in favor of the public grantor, and that such a grant passes only those rights and interests to the

grantee that are *necessarily and expressly* embraced in its terms. The language of section 1069 provides clear support for that proposition. Section 1069 states that *"every* grant by a public officer or body . . . is to be interpreted in favor of the grantor." (Italics added.) ■ Words of a statute are to be given a plain and commonsense meaning. When they are clear and unambiguous, there is no need to resort to other indicia of legislative intent, such as legislative history, to construe the statute. (*Quarterman v. Kefauver* (1997) 55 Cal.App.4th 1366, 1371 [64 Cal.Rptr.2d 741].) Further, " '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .' [Citations.]" (*Rodriguez v. Superior Court* (1993) 14 Cal.App.4th 1260, 1269 [18 Cal.Rptr.2d 120].)

■ The adjective "every" in section 1069 modifies only the phrase "grant by a public officer or body . . . to a private party;" it does not modify the statute's reference to grants in general. The phrase "every grant by a public officer or body . . . to a private party" is clear and unambiguous. The dictionary definition of "every," which reflects the plain and commonsense meaning of the word, is: "being each individual or part of a group *without exception.*" (Webster's 9th New Collegiate Dict. (1989) p. 430, italics added.) Accordingly, the rule in section 1069 that *every* grant by a public body is to be interpreted in favor of the grantor applies *without exception* to the construction of ambiguities in such grants.

As noted, Red Mountain disputes that the public grantor provision in section 1069 takes precedence over other rules of construction. Red Mountain contends that the primary objective of all contract or deed interpretation is to ascertain the parties' intent and that when, as here, conflicting evidence of intent is presented as an aid in interpretation, the trial court's interpretation must be affirmed if it is supported by substantial evidence. We agree with the general principle that the true intent of the parties should govern the interpretation of a written instrument, including a grant by a public entity. Section 1069 will not apply to give the public grantor a greater right than that for which it bargained *when the intent of the parties is clear.* (*City of Los Angeles v. Howard, supra,* 244 Cal.App.2d at p. 545.) However, when a grant by a public body is ambiguous, the controlling rule is the provision in section 1069 that *every* grant by a public body is to be interpreted in favor of the grantor. In such a case, extrinsic evidence of the parties' intent is irrelevant.

We conclude that the trial court erred by failing to interpret the access easement in Fallbrook's favor pursuant to section 1069. However, an appellant has the burden to show not only that the trial court erred but also that the error was prejudicial. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105 [87 Cal.Rptr.2d

754].) Error is prejudicial if it is reasonably probable that a result more favorable to the appellant would have been reached absent the error. (*Paterno v. State of California, supra,* 74 Cal.App.4th at p. 105; *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163].) " '[A] "probability" in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [16 Cal.Rptr.3d 374, 94 P.3d 513].) The requirement to show prejudice also applies to a claim of instructional error. A judgment is subject to reversal for state law error involving misdirection of the jury when there is a reasonable probability that in the absence of the error, the result would have been more favorable to the appealing party. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*); *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1213 [31 Cal.Rptr.2d 776, 875 P.2d 1279] [instructional error is prejudicial when it appears probable that the improper instruction misled the jury and affected the verdict].)

 We conclude that if the trial court had construed the access easement as limited to the Chaffins' personal ingress and egress, there is a reasonable probability that it would not have ruled that Fallbrook's refusal to grant the easement resulted in an inverse condemnation of Red Mountain's property. We further conclude that the trial court's failure to construe the access easement in Fallbrook's favor prejudicially affected the jury's verdict on Red Mountain's inverse condemnation/breach of contract claim. If the court had construed the access easement as limited to the Chaffins' personal ingress and egress and instructed the jury accordingly, it is reasonably probable that the jury would have found Fallbrook's refusal to grant the easement was not a breach of the 1978 agreement because the easement Red Mountain requested was much broader in scope than the personal easement Fallbrook had agreed to convey. Accordingly, the matter must be remanded for both a redetermination of Fallbrook's liability for inverse condemnation and a retrial to determine whether Fallbrook's refusal to grant the access easement constituted a breach of the 1978 agreement and, if so, the amount of damages Red Mountain suffered as a result.

If a jury on remand were to find that Fallbrook breached the agreement to grant the access easement, the issue regarding damages would be whether the easement would have enabled Red Mountain to develop the southerly portion of the Red Mountain Ranch property, even though the easement was limited in scope to personal ingress and egress. At trial, Red Mountain argued to the jury that it could be made whole for Fallbrook's refusal to grant the access easement either by an award of breach of contract/inverse condemnation damages with no severance damages in the direct condemnation case, or by an award of the same amount as severance damages and damages for Fallbrook's unreasonable precondemnation conduct in refusing to grant the

access easement. However, Red Mountain's counsel did not ask the jury to award damages for diminution of the value of *all* of the property Red Mountain had sought to subdivide and develop; rather, he asked the jury to award breach of contract/inverse condemnation damages in the amount of $1,672,308, representing the precondemnation value of Red Mountain's *southerly 207.38 acres* as two ranch sites valued at $12,000 per acre, minus the post-taking value of that acreage as "mitigation land"[7] valued at $4,000 per acre, plus engineering expenses of $13,268.[8] The jury's award reflects that the jury accepted this formula, except that it found the precondemnation value of the southerly 207.38 acres to be $11,000 per acre rather than $12,000 per acre.[9]

█ If the court had properly instructed the jury that the access easement contemplated in the 1978 agreement was limited to the Chaffins' personal ingress-egress and the jury had evaluated Red Mountain's inverse condemnation/breach of contract damages based on Red Mountain's contractual right to that limited easement, there is a reasonable probability that the jury would have found Red Mountain's transfer of the easement to successor owners of two large ranch estates would materially overburden the easement

---

[7] Red Mountain's expert appraiser, Robert Backer, explained to the jury that "mitigation land" is undeveloped land that a governmental agency permitting a development requires the developer to purchase to mitigate the environmental impact of the development. The mitigation land, which can be located on the development site or elsewhere, is preserved in its undeveloped state.

[8] Acreage of 207.38 x $12,000 ($2,488,560) - 207.38 x $4,000 ($829,520) = $1,659,040; $1,659,040 + $13,268 = $1,672,308. Although Red Mountain's counsel noted that in November 2000 (the date of valuation for the breach of contract and inverse condemnation causes of action) the Chaffins were "trying to get a subdivision approved[,]" he went on to state: "But in my analysis as an appraiser [referring to expert witness Backer], . . . I don't look at what the Chaffins are doing. I make an impartial determination of what was the highest and best use of the property at that time. [¶] And in my analysis, Mr. Backer said, the highest and best use after I studied the market and I studied comparable sales and I studied the adaptability of the property that—the highest and best use was to use this property as two large, estate-type sites. Okay. Two separate homesites, large, estate types of sites. [¶] And for that value, . . . the value is $12,000 per acre for 207 acres. *And why is it 207 acres instead of 580 acres?* It's because, as [Backer] testified, he determined that the 207 acres that were in the southernmost portion of the property—in other words, the most easily served by the Red Mountain Dam road access—should be viewed separately, because of their proximity to that access, as acreage that would be likely developed. *And all the acreage to the north wouldn't be really counted in this evaluation because that acreage is too remote from the Red Mountain Dam access in order to make it palatable.*" (Italics added.)

[9] Acreage of 207.38 x $11,000 ($2,281,180) - 207.38 x $4,000 ($829,520) = $1,451,660; $1,451,660 + $13,268 (engineering fees) = $1,464,928, the amount of breach of contract/inverse condemnation damages the jury awarded. Having awarded breach of contract/inverse condemnation damages, the jury followed Red Mountain's counsel's directive and awarded no severance damages or damages for precondemnation conduct.

and unreasonably interfere with Fallbrook's rights.[10] The owner of an easement cannot materially increase the burden of the easement on the servient estate or impose a new burden. (*Wall v. Rudolph* (1961) 198 Cal.App.2d 684, 686 [18 Cal.Rptr. 123].) "Normal future uses [of an easement] are within the reasonable contemplation of the parties and therefore permissible, but uncontemplated, abnormal uses, which greatly increase the burden, are not." (12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 407, p. 478.) Whether a particular use of an easement by either the servient or dominant owner unreasonably interferes with the rights of the other owner is a question of fact. (*Pacific Gas & Elec. Co. v. Hacienda Mobile Home Park* (1975) 45 Cal.App.3d 519, 528 [119 Cal.Rptr. 559]; *City of Los Angeles v. Howard, supra,* 244 Cal.App.2d at p. 543.)[11] If the jury had found that a transfer of the access easement to successor owners of two large ranch estates would have materially overburdened the easement and, therefore, Red Mountain's southerly 207.38 acres could have been used only as mitigation land even if Fallbrook had granted Red Mountain the access easement, the likely result, assuming liability, would have been a lower award of damages for inverse condemnation/breach of contract.

Our reversal of the judgment as to the inverse condemnation/breach of contract claims requires that the issue of just compensation for Fallbrook's direct condemnation of Red Mountain's property also be retried. Under a correct interpretation of the scope of the access easement under section 1069, the trial court could conclude that Fallbrook's refusal to grant the easement did not result in an inverse condemnation of Red Mountain's property. In that case, there would be no award of damages for inverse condemnation/breach of contract. However, Red Mountain would be entitled to seek severance damages on the direct condemnation claim, as well as damages for Fallbrook's precondemnation conduct in refusing to grant the access easement and for the direct condemnation of Red Mountain's contractual right to the easement.

The award of $872,560 for direct condemnation reflects the jury's determination of fair market value of the condemned land as of February 1, 2004, as mitigation land *with no access.* If there was no inverse condemnation/breach of contract, Red Mountain would have had a contractual right to an access easement until Fallbrook directly condemned that right. Under that scenario, a

---

[10] This analysis assumes that proper construction of the access easement under section 1069 does not automatically preclude findings of inverse condemnation and breach of contract against Fallbrook.

[11] Fallbrook's position appears to be that *any* use of the access easement beyond its historical use for the Chaffins' personal ingress and egress would have unreasonably interfered with Fallbrook's rights as the servient owner of that easement, as well as with its rights as the dominant owner of the sanitary easement.

jury on retrial could find that the value of the property that was directly condemned was higher than the value the jury awarded for direct condemnation in the first trial.

The trial court's erroneous interpretation of the access easement and its misdirection of the jury on that point prejudicially affected the outcome of the trial with respect to Red Mountain's claims for inverse condemnation and breach of contract. These errors, in turn, may have prejudicially affected the jury's determination of just compensation on Fallbrook's direct condemnation claim. Because resolution of the inverse condemnation/breach of contract claims could have affected the determination of just compensation for the direct condemnation, the judgment is not severable. (*Gonzales v. R. J. Novick Constr. Co.* (1978) 20 Cal.3d 798, 805–806 [144 Cal.Rptr. 408, 575 P.2d 1190].) Therefore, the entire judgment must be reversed.[12]

### III. *Relocation of the Access Easement*

In the first phase of the trial, the court ruled that the parties had impliedly consented to relocate the access easement to the new Red Mountain Dam

---

[12] Fallbrook's appeal and request for reversal is directed to "the judgment" generally, not just to the portion of the judgment involving Red Mountain's inverse condemnation/breach of contract claims. Even if Fallbrook had appealed only those portions of the judgment involving the inverse condemnation/breach of contract claims, we could not properly reverse only those portions of the judgment. " 'The test of whether a portion of a judgment appealed from is so interwoven with its other provisions as to preclude an independent examination of the part challenged by the appellant is whether the matters or issues embraced therein are the same as, or interdependent upon, the matters or issues which have not been attacked. [Citations.] "[I]n order to be severable, and therefore [separately] appealable, any determination of the issues so settled by the judgment . . . must not affect the determination of the remaining issues whether such judgment on appeal is reversed or affirmed. . . . Perhaps another way of saying it would be that the judgment is severable when the original determination of those issues by the trial court and reflected in the judgment or any determination which could be made as a result of an appeal cannot affect the determination of the remaining issues of the suit. . . ." [Citation.]' [Citation.]" (*Gonzales, supra,* 20 Cal.3d at pp. 805–806.) Here, as discussed above, the determination of the inverse condemnation/breach of contract claims could affect the determination of just compensation on the direct condemnation claim.

Because the judgment is not severable, Red Mountain was not required to pursue a cross-appeal from the judgment or to take other steps to ensure that the award of just compensation for the direct condemnation would be reversed if this court were to reverse the judgment as to the inverse condemnation/breach of contract claims. "[T]he failure to take an appeal demonstrates only satisfaction with the judgment *as is,* not as changed by a partial reversal. One may elect to stand upon a judgment which, he believes, although largely in his favor, does not give him all of the benefits to which he is entitled. To avoid the time and expense of further litigation, he may be persuaded to permit the unfavorable portions to stand in reliance upon the benefits received in the other parts. In such instance, to do justice a reversal of the portion from which the appeal was taken might require a reversal of other provisions." (*American Enterprise, Inc. v. Van Winkle* (1952) 39 Cal.2d 210, 221 [246 P.2d 935] fn. omitted.)

Road after the "existing road" referred to in the 1978 agreement was obliterated by the reservoir expansion.[13] Fallbrook contends the trial court's ruling was erroneous because the 1978 agreement explicitly referred to the "existing road" as the location of the easement.[14] Fallbrook argues that an intention to relocate an easement should be specified in the granting document so that a floating easement is established.

■ We conclude that the trial court's finding that the parties impliedly consented to relocate the easement was not erroneous. Parties may change the location of an easement by mutual consent, which may be implied from use and acquiescence. (*Johnstone v. Bettencourt* (1961) 195 Cal.App.2d 538, 541–542 [16 Cal.Rptr. 6]; *Kosich v. Braz* (1967) 247 Cal.App.2d 737, 739 [56 Cal.Rptr. 52].) When the parties consent to relocation, their "rights are not affected by the change, but attach to the new location. [Citation.]" (*Johnstone v. Bettencourt, supra*, 195 Cal.App.2d at p. 542.) Whether parties have impliedly consented to relocate an easement is a question of fact. (*Ibid.*; see also *Stanardsville Volunteer Fire Co. v. Berry* (1985) 229 Va. 578 [331 S.E.2d 466, 470].)

Here, the trial court's finding that the parties impliedly consented to relocate the access easement referenced in the 1978 agreement to Red Mountain Dam Road is amply supported by undisputed facts that the trial court cited in its statement of decision. The court noted: "Upon the completion of the reservoir expansion in approximately 1983, the agents of [Fallbrook] authorized the Chaffins to use the new roadway immediately to the west of the ODR after completion of the reservoir. Despite the fact that agents of [Fallbrook] had erected a fence and locked that roadway from general public use, the Chaffins were given keys to access the roadway and continued their use of this new roadway for many years, unobstructed, up and until and through the time of this particular lawsuit." These undisputed facts are sufficient to support the trial court's finding that the parties impliedly consented to relocate the access easement from the ODR to the newer road immediately to the west of the expanded reservoir.

---

[13] The trial court in its statement of decision referred to the "existing road" referenced in the 1978 agreement as the "old dirt road" or "ODR."

[14] Fallbrook's main argument under this assignment of error is that the trial court erred in ruling that the scope of the relocated easement was for "any legitimate or legal purpose" and that it was not limited to the Chaffins' historic use of the ODR for their own personal ingress and egress. In light of our conclusion that the trial court was required to interpret the easement in Fallbrook's favor under section 1069, we limit our discussion in this section of the opinion to Fallbrook's contention that the court erred in relocating the access easement.

## IV. *The Trial Court's Interpretation of the Sanitary Easement*

Fallbrook contends that the trial court committed reversible error by failing to rule on Fallbrook's cause of action for declaratory relief, which Fallbrook characterizes as asking "the court to determine that Red Mountain's proposed subdivision violated the [s]anitary [e]asement." Fallbrook argues that the trial court erred by failing to interpret the sanitary easement, and strongly suggests that the only correct interpretation of the easement is that it entirely precluded Red Mountain's proposed subdivision.

We find no reversible error in the trial court's handling of Fallbrook's declaratory relief cause of action. Preliminarily, it is important to clarify exactly what relief Fallbrook sought in that cause of action. Fallbrook asked the court to enter a judgment declaring that the "127 acre sanitary easement" was valid and enforceable against Red Mountain and, as stated in Fallbrook's cross-complaint:

"d) That pursuant to the [easement], *within the 127 ACRES*, Fallbrook is entitled to prevent Red Mountain from excavating, grading, trenching, digging, drilling, or moving dirt or native soil for any purpose, including but not limited to septic systems, leach lines, septic tanks, pipelines, roads, footings for house pads, roads, etc.; and

"e) That pursuant to the [easement], *within [the] 127 ACRES*, Fallbrook is entitled to prevent Red Mountain from building or constructing any work of improvement, including but not limited to roads, septic systems, septic tanks, leach lines, pipelines, house footings, house pads, houses, barns, landscaping and irrigation systems, or other structures; and

"f) That pursuant to the [easement], *within the 127 ACRES*, Fallbrook is entitled to prevent Red Mountain from discharging any human or animal waste, insecticides, pesticides, herbicides or fertilizers of any type on to [*sic*], in, on top of, or under the soil; and

"g) That pursuant to the [easement], Fallbrook is entitled to prevent Red Mountain from keeping, maintaining, storing, using, applying, or discharging, any HAZARDOUS MATERIAL; and

"h) That *within the 127 ACRES,* Red Mountain is not entitled to perform or permit any other action or activity that violates the terms and conditions of the [easement]." (Italics added.)

In short, in its declaratory relief cause of action, Fallbrook asked the trial court to decide, as a matter of law, that the sanitary easement precluded any

and all development *in the easement area*; it did not ask the court to decide whether the sanitary easement precluded Red Mountain from developing Red Mountain Ranch property outside of the sanitary easement area, or whether use of the access easement for a subdivision would overburden the sanitary easement. The trial court effectively decided the issue Fallbrook raised in its pleadings by ruling that it was premature to decide, in the court's words, "whether [Red Mountain's] proposed development might result in possible contamination of the [sanitary easement area] . . . ." This ruling implicitly rejects Fallbrook's claim that the sanitary easement precluded *any and all* development within the sanitary easement area as a matter of law, and effectively decided that whether particular development activities within that area would overburden the sanitary easement was a question of fact to be decided based on the specific development plan ultimately approved by the county. The trial court explained: "The final lot subdivision maps have neither been established nor approved. Until such time as plaintiffs' applications succeed in going through some kind of approval process . . . and a final lot map is approved, the Court is not in possession of sufficient facts to determine whether such lots would constitute an encroachment into the watershed and a risk to the water quality."

The trial court's approach is in accord with the rule that "[w]hether a particular use of the land by the servient owner, or by someone acting with his authorization, is an unreasonable interference is a question of fact . . . . [Citations.]" (*Pasadena v. California-Michigan etc. Co.* (1941) 17 Cal.2d 576, 579–580 [110 P.2d 983].) The trial court noted the creation of the sanitary easement in 1949 and ruled that Red Mountain was bound by its terms. However, the trial court could reasonably conclude that it was not in a position to rule, as a matter of law, that *any* development within the area of the sanitary easement would threaten the reservoir water and thus was precluded.

In any event, Fallbrook's bid for declaratory relief—i.e., for a judicial determination that the sanitary easement precluded any development activity within its area as a matter of law—was rendered moot by Fallbrook's direct condemnation of the land within the sanitary easement. Once Fallbrook took the sanitary easement acreage by eminent domain, it was unnecessary for the court to decide whether Red Mountain could develop that land. To the extent the court erred by not interpreting the sanitary easement for purposes of the jury's determination of just compensation to be paid by Fallbrook for the land within the sanitary easement, the error was harmless because the jury valued the land as undevelopable mitigation land.[15]

---

[15] Red Mountain presented evidence and argued that the 134.24 acres Fallbrook directly condemned was worth $10,000 per acre as mitigation land. The jury valued the land taken at $872,560 or $6,500 per acre ($872,560 divided by 134.24 acres = $6,500 per acre). The jury's

## V. *The Court's Determination of Inverse Condemnation*

Fallbrook contends that the trial court committed reversible error in deciding that Fallbrook was liable for inverse condemnation. Specifically, Fallbrook contends that there can be no inverse condemnation because (1) it filed a direct condemnation action; (2) the access easement was not intended for subdivision use; (3) Fallbrook had a right not to grant a road easement for a subdivision; and (4) Red Mountain previously gave up the rights allegedly taken.

### A. *Effect of the eminent domain action on the inverse condemnation action*

Fallbrook asserts that once a public entity files a direct condemnation action, an inverse condemnation claim is subsumed into the direct action and may no longer be pursued. As authority for that proposition, Fallbrook cites *Klopping v. City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345] (*Klopping*) and *Richmond Redevelopment Agency v. Western Title Guaranty Co.* (1975) 48 Cal.App.3d 343 [122 Cal.Rptr. 434] (*Richmond*). Fallbrook contends that the trial court's error in allowing Red Mountain to pursue its inverse condemnation cause of action after Fallbrook filed its direct condemnation action was prejudicial because it allowed for a double recovery of damages—for both inverse and direct condemnation.

Preliminarily, we conclude that there was not a double recovery of damages. Fallbrook's double recovery argument is based on the fact that the 207.38-acre parcel for which the jury awarded Red Mountain breach of contract/inverse condemnation damages of $1,464,928 includes the 134.24-acre parcel that Fallbrook directly condemned, for which the jury separately awarded Red Mountain $872,560 in the direct condemnation action. The trial court did not err in allowing these separate awards, as the two awards compensated Red Mountain for different losses that occurred at different times. The breach of contract/inverse condemnation award compensated Red Mountain for the *diminution in value* of the 207.38 southerly acres that resulted from Fallbrook's refusal in August 2000 to grant the access easement as promised in the 1978 agreement. This award reflects the jury's finding that without the access easement, the land could be used only as mitigation land.

valuation was presumably based on the testimony of Fallbrook's expert appraiser, James Brabant, that similar land sold from a nearby "mitigation bank" was selling for $6,500 per acre. Referring to sales "going back clear [until] November 2000[,]" Brabant testified that "the prices are almost all at $6,500 an acre. . . . [O]ne of the reasons why I didn't increase the value of the property when I updated it was . . . there had been no price increase. In this mitigation bank, they have stuck with the $6,500 per-acre figure going clear back to November of 2000 here. So there was no indication of price appreciation occurring here."

The jury's eminent domain award compensated Red Mountain for the 134.24 acres that Fallbrook later directly condemned. The eminent domain award reflects the jury's finding that on February 1, 2004, the agreed date of value in the direct condemnation action, the highest and best use of the directly condemned land was as mitigation land, which was consistent with its award of inverse condemnation/breach of contract damages. If Fallbrook breached its agreement to convey a personal ingress-egress easement, Red Mountain would be entitled to compensation for any diminution in the value of its land suffered in 2000 as a result of that breach, as well as just compensation for the direct taking of the land by eminent domain in 2004. (See *Shealy v. Unified Government of Athens-Clarke* (2000) 244 Ga.App. 853 [537 S.E.2d 105, 107–108] [inverse condemnation claim by landowners against counties based on contamination of their property by landfill was not rendered moot by counties' later direct condemnation of fee simple title, as damage alleged by landowners in form of diminution in value of their property caused by contamination occurred before the direct taking and, therefore, would not be recoverable in the eminent domain action]; *City of Lake Station v. Rogers* (Ind. 1986) 500 N.E.2d 235, 238–239 [landowner should not be denied compensation for partial taking by inverse condemnation simply because the city later chose to take the entire fee simple].)

Neither *Klopping* nor *Richmond* precluded Red Mountain from pursuing its breach of contract/inverse condemnation claims after Fallbrook filed its eminent domain action. Applying *former* eminent domain statutes, *Richmond* held that a property owner's inverse condemnation cross-complaint was properly struck because it sought the same type of damages the property owner was required to seek by answer to the direct condemnation complaint and would have obtained as part of the eminent domain award. However, *Richmond* was decided under obsolete eminent domain statutes that required the defendant property owner to allege the amount of damages claimed by reason of the taking in the answer to the eminent domain complaint. (See *Richmond, supra*, 48 Cal.App.3d at p. 351.) In any event, *Richmond* does not apply here because Red Mountain did not seek the same type of damages or compensation in its inverse condemnation cause of action that it could recover in Fallbrook's direct condemnation action. The inverse condemnation damages Red Mountain sought were for the diminution in the value of its land that occurred before Fallbrook decided to bring the direct condemnation action.

*Klopping* held that as between a city's eminent domain action and an inverse condemnation action involving the same property, the case that proceeds to judgment first is res judicata *as to issues common to both actions* and bars recovery in the other action of any damages that were or could have been recovered in the action that proceeded to judgment first. (*Klopping, supra*, 8 Cal.3d at p. 58.) *Klopping* is inapposite because Fallbrook's eminent

domain action and Red Mountain's inverse condemnation action were consolidated and proceeded to judgment together, and the two actions did not involve the exact same property, legal issues or damages. In any event, *Klopping* does not support the proposition that an inverse condemnation action cannot exist contemporaneously with an eminent domain action involving the same property. *Klopping* contemplates separate, unconsolidated actions pending simultaneously, with one of the actions proceeding to judgment first and precluding a later judgment in the other action on the same issues. The trial court did not err in allowing both Red Mountain's inverse condemnation action and Fallbrook's eminent domain action to proceed.

## B. *Nature of the access easement*

Fallbrook's remaining three contentions as to why the trial court erred in finding inverse condemnation essentially amount to a single argument: that Fallbrook did not inversely condemn Red Mountain's land because Red Mountain had no right to an access easement for purposes of a subdivision.[16] We reject Fallbrook's implied premise that as a matter of law, Fallbrook's refusal to grant the access easement referenced in the 1978 agreement damaged Red Mountain only if the easement was intended for subdivision purposes. Fallbrook concedes that it agreed to grant an easement for the Chaffin's personal ingress to and egress from their property. Whether Fallbrook breached that agreement and, if so, whether Red Mountain suffered damages as a result, are questions of fact to be resolved on remand.[17]

## VI. *Evidence of Damages*

Fallbrook contends that the trial court committed reversible error by admitting evidence of speculative inverse condemnation damages. Although we reverse the finding of inverse condemnation, we address this issue for the guidance of the trial court and the parties in the event of a retrial. (See *People v. Neely* (1993) 6 Cal.4th 877, 896 [26 Cal.Rptr.2d 189, 864 P.2d 460]; Code Civ. Proc., § 43.) Fallbrook specifically objects to testimony by Red Mountain's expert appraiser, Robert Backer, who presented four valuation analyses to the jury, two of which involved valuing the land that Fallbrook directly condemned and calculating severance damages to the

---

[16] Under separate argument headings, Fallbrook contends there was no inverse condemnation because (1) the access easement was not for subdivision use; (2) the sanitary easement gave Fallbrook the right to refuse a road easement for a subdivision; and (3) Red Mountain had no right to a subdivision easement because its predecessor agreed to the sanitary easement.

[17] Specifically, whether Red Mountain could have developed its southerly 207.38 acres if Fallbrook had granted the limited personal ingress/egress easement it agreed to grant is a question of fact.

remaining Red Mountain Ranch property. The fourth damage theory, entitled "Breach Analysis," valued only Red Mountain's southerly 207.38 acres both before and after Fallbrook's refusal to grant the access easement. As noted, the jury adopted this damage analysis.

Fallbrook contends that the trial court erred in allowing Backer to present his breach analysis, his condemnation analysis that was based on Red Mountain having an approved tentative subdivision map for 44 lots, and his condemnation analysis that was based on Red Mountain not having an approved map.[18] Citing *Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1105 [125 Cal.Rptr.2d 12] (*Emeryville*), Fallbrook maintains that these analyses were inadmissible because they constitute speculative evidence of damages based on specific plans of development.

■■■ The trial court has considerable discretion in determining the admissibility of valuation evidence in condemnation proceedings. (*City of San Diego v. Sobke* (1998) 65 Cal.App.4th 379, 396 [76 Cal.Rptr.2d 9].) Accordingly, we review evidentiary rulings for an abuse of discretion. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900 [122 Cal.Rptr.2d 802].) As a general rule, "a property owner may not value his property based upon its use for a projected special purpose or for a hypothetical business. [Citations.]" (*County of San Diego v. Rancho Vista Del Mar, Inc.* (1993) 16 Cal.App.4th 1046, 1059 [20 Cal.Rptr.2d 675].) However, "[w]hile a property owner may not generally present evidence of the value of his property ' "in terms of money" ' that the property would bring for a special purpose [citation], evidence of a particular use may be relevant to establishing the highest and best use since such evidence may tend to establish the property's adaptability for that kind of use [citations]." (*Id.* at pp. 1059–1060.) Generally, evidence that condemned property is suitable for a particular purpose may properly be admitted when the highest and best use of the property is disputed or there is a dispute as to the feasibility of a particular use. (*Emeryville, supra,* 101 Cal.App.4th at pp. 1104–1105; *People ex rel. Dept. of Transportation v. Tanczos* (1996) 42 Cal.App.4th 1215, 1219 [50 Cal.Rptr.2d 70].)

One of the main disputed issues at the trial in this case was the highest and best use of the subject property and, in particular, whether a subdivision development on the property was feasible. Consequently, the trial court did not abuse its discretion in allowing the jury to hear Backer's various valuations of the property based on Red Mountain's evidence that the land

---

[18] Fallbrook does not object to Backer's third damage analysis, which valued Red Mountain's southerly 207.38 acres as mitigation land both before and after Fallbrook directly condemned 134.24 acres of the land.

was suitable for a subdivision development. In any event, following the directive of Red Mountain's counsel in closing argument, the jury used Backer's breach analysis, which ignored the majority of Red Mountain's property and awarded damages based only on use of the southerly 207.38 acres as two ranch estates. Backer's testimony about this use of the 207.38 acres was admissible "highest and best use" testimony; it did not constitute testimony about a *specific* development plan, as it was not based on evidence of any specific plan for two ranch estates or any specific features of the hypothetical estates, such as location of the building pads or septic systems. Backer simply valued the land as being generally useable for two large ranch estates. The court did not abuse its discretion in allowing Backer's valuation testimony.[19]

## VII. *Jury Instructions*

Fallbrook contends that the trial court incorrectly instructed the jury and erroneously refused to give certain instructions that Fallbrook requested.

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule, supra*, 8 Cal.4th at p. 572.) "A civil litigant must propose complete instructions in accordance with his or her theory of the litigation and a trial court is not 'obligated to seek out theories [a party] might have advanced, or to articulate for him that which he has left unspoken.' [Citations.]" (*Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1686 [12 Cal.Rptr.2d 279].) Instructional error in a civil case is not ground for reversal unless it is probable the error prejudicially affected the verdict. (*Soule, supra*, 8 Cal.4th at p. 580.) In determining whether instructional error was prejudicial, a reviewing court must evaluate "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580–581, fn. omitted.)

"Instructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law. [Citations.] Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition. [Citations.]" (*Fibreboard Paper*

---

[19] In light of our conclusion that, under section 1069, the access easement referenced in the 1978 agreement was intended for personal ingress/egress and not for access to a subdivision development, if the diminution in the value of Red Mountain's land resulting from Fallbrook's refusal to grant an access easement becomes an issue on remand, the issue is likely to be limited to diminution in the value of Red Mountain's southerly 207.38 acres.

*Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718 [39 Cal.Rptr. 64].) Finally, "[e]rror cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given. [Citations.]" (*Id.* at p. 719; see *Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 335 [145 Cal.Rptr. 47].)

### A. *Instructions given*

Fallbrook first argues that the trial court erred in instructing the jury that it had to follow the court's rulings from the first phase of the trial. The trial court erred in instructing the jury to follow its legal rulings only to the extent those rulings were erroneous. Because we have addressed Fallbrook's challenges to the trial court's legal rulings above, we will not further address those rulings in the context of alleged instructional error.

Fallbrook next argues that the instructions the trial court gave regarding damages for breach of contract and inverse condemnation were erroneous because they did not instruct how those damages relate to just compensation in Fallbrook's direct condemnation action. Fallbrook complains that the direct condemnation action required the jury to value the same land at issue in the breach of contract/inverse condemnation action and, therefore, the trial court should have given an explicit instruction that the jury could not award duplicative damages, and that awarding damages twice for the same loss is duplicative as a matter of law.

Fallbrook's argument is not so much a claim of instructional error as a legal argument that Red Mountain may not recover compensation for the diminution in value of its 207.38 southerly acres as a result of any breach of contract by Fallbrook in August 2000, and also recover compensation for the portion of that land that Fallbrook later directly condemned. As we discussed above, we reject this argument because the breach of contract/inverse condemnation award and the eminent domain award did not compensate Red Mountain twice for the same loss; they compensated Red Mountain for different losses that occurred at different times.

### B. *Instructions refused*

Fallbrook contends that the trial court erred by refusing to give the following instructions: (1) that a plaintiff may not recover the same damages for both a breach of contract claim and a tort claim that are based on the same facts (Judicial Council of Cal., Civ. Jury Instns., CACI No. 361); (2) that the owner of the dominant estate must use its easement in such a way as to impose as slight a burden as possible on the servient estate; (3) that a sanitary

easement is similar to a conservation easement; (4) that Fallbrook was not obligated to grant the access easement if the jury found the requested easement would overburden Fallbrook's sanitary easement and reservoir; and (5) that the jury is not "permitted to value the property with reference to what it was worth to the defendant for speculation or merely for possible uses . . . ." (BAJI 11.75.)

### 1. *Failure to instruct with CACI No. 361*

CACI No. 361 instructs that when a plaintiff has brought claims in both contract and tort against a defendant and the jury finds that the plaintiff "has proved both claims, the same damages that resulted from both claims can be awarded only once." Fallbrook argues that the trial court's failure to give this instruction allowed the jury to improperly award duplicative damages for breach of contract/inverse condemnation and Fallbrook's direct condemnation.

Preliminarily, the record does not clearly show that Fallbrook requested that the trial court give CACI No. 361. The only indication in the record that the trial court considered giving this instruction is a letter from Fallbrook's counsel to the trial court expressing Fallbrook's opposition to a proposed final judgment. In that letter, Fallbrook's counsel states that after discussing the issue of duplicative damages "with both counsel, the court decided not to give CACI 361 . . . since the court would ensure there would be only one award for damages." In any event, Fallbrook was not prejudiced by the court's refusal to give a duplicative damages instruction because the judgment does not award duplicative damages. As discussed above, the compensation the jury awarded Red Mountain for the land Fallbrook directly condemned was not duplicative of the jury's award of breach of contract/inverse condemnation damages.

### 2. *Failure to instruct that the owner of the dominant estate must use its easement in such a way as to impose as slight a burden as possible on the servient estate*

Fallbrook contends that the trial court should have instructed the jury that the owner of the dominant estate must use its easement in such a way as to impose as slight a burden as possible on the servient estate, as stated in *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 356 [27 Cal.Rptr.2d 613, 867 P.2d 724]. This proposed instruction presumably concerns the access easement, not the sanitary easement, since Fallbrook would have been the owner of the servient estate as to the access easement, if the easement had been granted.

Fallbrook does not explain in its opening brief why the trial court's rejection of this instruction was erroneous or how it prejudicially affected the

verdict. The only argument on this point is in Fallbrook's reply brief, in which Fallbrook asserts that "[t]he jury was given no guidance as to what the fee owner could or could not do as compared to the rights of the easement holder." Fallbrook presumably requested this instruction in connection with its theory that it was excused from its contractual obligation to grant Red Mountain an access easement under the 1978 agreement because Red Mountain's intended use of the easement for a large subdivision would overburden Fallbrook's servient estate by threatening the reservoir.

The trial court properly refused to give this instruction, as it is argumentative and unduly emphasizes Fallbrook's overburdening theory. Further, the subject matter of the instruction and the legal point Fallbrook presumably intended it to convey regarding a dominant estate owner's duty not to overburden the servient estate was substantially covered by the following portion of a special instruction the trial court did give: "Overburdening an easement is defined as a use which *unreasonably increases the burden on the servient estate* and depends on the facts of each case. Every easement includes the right to do such things that are necessary for the full enjoyment of the easement itself. But this right must be exercised in such a reasonable manner *as to not injuriously increase the burden on the servient estate.*" (Italics added.) Fallbrook has not shown that the trial court prejudicially erred by refusing to give Fallbrook's proposed special instruction based on *Locklin.*

### 3. *Failure to give requested instruction regarding the sanitary easement*

Fallbrook contends that the trial court erred in refusing to give the following instruction, which includes the definition of "conservation easement" in the exact language of Civil Code section 815.1: A sanitary easement is similar to a conservation easement and means "any limitation in a deed will or other instrument in the form of an easement, restriction, covenant, or condition, which is or has been executed by or on behalf of the owner of the land subject to such easement and is binding upon successive owners of such land, and the purpose of which is to retain land predominantly in its natural, scenic, historical, agricultural, forested or open-spaced condition."

The trial court properly rejected this instruction because the sanitary easement is not a conservation easement. The purpose of the sanitary easement is to enable Fallbrook "to patrol, control and maintain sanitary conditions [in the easement area] necessary and adequate to keep the water stored in [the] reservoir . . . free from contamination from [the] surrounding watershed area and to enable [Fallbrook] to comply with [public health laws and regulations] . . . ." Whether protecting the reservoir water and complying with public health laws require that Fallbrook maintain the

easement area "predominantly in its natural, scenic, historical, agricultural, forested or open-spaced condition" was a disputed factual issue at trial.[20] Fallbrook's proposed "conservation easement" instruction would have effectively directed the jury to find, as a matter of law, that the sanitary easement imposed the same restrictions on Red Mountain's use of the easement area that a conservation easement would have imposed. The trial court properly refused the instruction, as it is both argumentative and legally incorrect.

4. *Failure to instruct that Fallbrook was not obligated to grant a subdivision access easement if the jury found that such an easement would overburden Fallbrook's sanitary easement and reservoir*

Fallbrook contends that the trial court erred in refusing to give its proposed special instruction that states, in relevant part: "The Chaffins have requested a road easement for a proposed development. [Fallbrook] has refused to grant the road easement. If you find the requested road easement would overburden Fallbrook's 1949 [s]anitary [e]asement and reservoir, then Fallbrook was not obligated to grant the easement to the Chaffins." Fallbrook argues that the trial court should have given this instruction because it is consistent with the sanitary easement and with Civil Code section 815.7.

Civil Code section 815.7 concerns enforcement of conservation easements, and thus is inapplicable to this case. In any event, the essential point of the refused instruction—that Fallbrook was excused from granting the access easement if the easement would threaten the reservoir—was substantially and less argumentatively covered by the following special instruction that the court did give regarding Fallbrook's ability of performance: "Fallbrook . . . has the burden to show that performance of the contract was excused and the contract discharged because performance of the contract became impossible except at impractical, excessive, unreasonable expense or risk of injury not contemplated by the parties at the time the contract was made." This instruction, along with the above noted instruction defining "overburdening an easement," adequately conveyed to the jury that Fallbrook was excused from performing its contractual obligation to grant the access easement agreement if the jury found that performance would overburden the sanitary easement and risk contamination of the reservoir. The court did not prejudicially err in refusing Fallbrook's special instruction.

5. *Failure to give BAJI No. 11.75*

Finally, Fallbrook contends that the trial court erred in refusing to give BAJI No. 11.75, which instructs the jury in an eminent domain case that it is "not

---

[20] Red Mountain presented expert testimony that proposed development within the sanitary easement area would not cause contamination of the reservoir.

permitted to value the property with reference to what it was worth to the defendant for speculation or merely for possible uses . . . ." Fallbrook contends that it was error to refuse to give this instruction because the trial court allowed speculative testimony and evidence about Red Mountain's uses of the property. We reject this contention in light of our conclusion that the evidence in question was not inadmissibly speculative; rather, it constituted admissible evidence of the property's highest and best use. Moreover, the subject matter of the portion of BAJI No. 11.85 in question was substantially covered by the following modified version of BAJI No. 11.86 (regarding severance damages), which the trial court gave: "In assessing the damages, if any, to the [eminent domain] defendant's remaining property, caused by the project, you are not permitted to consider any factors that are speculative or imaginary, or any purely personal elements that do not affect the property's fair market value. Severance damages can, however, be based on any factor, resulting from the project, that causes a decline in the fair market value. [¶] *Damages are not to be enhanced for frustration of a proposed development which is speculative and conjectural.*" (Italics added.) The trial court did not commit reversible instructional error in refusing to give BAJI No. 11.75.

## VIII. *Verdict Form*

Fallbrook contends that the trial court prejudicially erred by refusing to include Fallbrook's contract defense of impossibility or impracticability of performance in the special verdict form and by failing to ensure that the verdict form protected against duplicative damages.

The use of special interrogatories in a verdict form lies within the sound discretion of the trial court, and the court's determination will not be disturbed on appeal absent a clear abuse of discretion. (*Masonite Corp. v. Pacific Gas & Electric Co.* (1976) 65 Cal.App.3d 1, 11–12 [135 Cal.Rptr. 170].) The trial court's refusal to include specific questions about impossibility or impracticability of performance in the verdict form was not an abuse of discretion, nor was it prejudicial, because, as discussed above, the jury was instructed to find that Fallbrook's performance of the contract was excused and the contract discharged if Fallbrook met its burden of proving that its performance became "impossible except at impractical, excessive, unreasonable expense or risk of injury not contemplated by the parties at the time the contract was made." We presume that the jury followed the instructions it was given (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803 [16 Cal.Rptr.3d 374, 94 P.3d 513]), and that it would not have found that Fallbrook breached

its agreement to grant the access easement if it had found that Fallbrook's performance was impossible or impracticable.[21]

To the extent the court erred by not ensuring that the verdict form protected against duplicative damages, the error was harmless because, as discussed above, there was no award of duplicative damages.

## IX. *Award of Litigation Expenses*

Red Mountain filed a motion to recover its litigation expenses, including expert and attorney fees, under Code of Civil Procedure sections 1036 "and/or" 1250.410. Red Mountain sought expert witness fees in the amount of $221,079 and attorney fees in the amount of $222,737, plus $4,000 for bringing the motion. The court granted Red Mountain's motion "in its entirety."

 Code of Civil Procedure section 1036 provides: "In any inverse condemnation proceeding, the court rendering judgment for the plaintiff by awarding compensation . . . shall determine and award or allow to the plaintiff, as a part of that judgment . . . a sum that will, in the opinion of the court, reimburse the plaintiff's reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of that proceeding in the trial court or in any appellate proceeding in which the plaintiff prevails on any issue in that proceeding." In awarding litigation expenses under this section, the trial court generally should apportion between attorney fees incurred in litigating the inverse condemnation claim and fees incurred with respect to other claims for which attorney fees are not recoverable, and award only the former. (*Greater Westchester Homeowners Assn. v. City of Los Angeles* (1979) 26 Cal.3d 86, 103–104 [160 Cal.Rptr. 733, 603 P.2d 1329]; *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.*, (1985) 172 Cal.App.3d 914, 958 [218 Cal.Rptr. 839].) However, the trial court has discretion to award fees incurred with respect to a noninverse condemnation cause of action that is relevant to the inverse condemnation claim. (*Salton Bay Marina, Inc. v. Imperial Irrigation Dist, supra*, 172 Cal.App.3d at p. 958.)

---

[21] When Fallbrook's counsel asked the trial court to include the defense of impossibility or impracticability in the verdict form, the court noted that the defense was covered by a jury instruction and advised counsel that it was his job to argue the defense as a basis for answering "no" to the special verdict question of whether Fallbrook had breached the contract to grant the access easement. During closing argument, Fallbrook's counsel quoted the above noted instruction regarding impossible or impractical performance and argued that the jury should find that Fallbrook had not breached the contract, stating: "Nobody contemplated in 1978 or back in 1949 that there was going to be a subdivision which was going to cause—or potentially contaminate the reservoir. That's why Fallbrook did what it did."

Code of Civil Procedure section 1250.410, subdivision (b) authorizes the trial court to award litigation expenses to the defendant in an eminent domain case "[i]f the court, on motion of the defendant made within 30 days after entry of judgment, finds that the offer of the plaintiff was unreasonable and that the demand of the defendant was reasonable viewed in the light of the evidence admitted and the compensation awarded in the proceeding . . . ." The "purpose [of Code of Civil Procedure section 1250.410] is to encourage settlement of condemnation actions by providing incentives to a party who submits a reasonable settlement offer or demand before trial. [Citation.] A property owner who files a reasonable demand, but is required nonetheless to litigate because of the public agency's unreasonable position, can be fully compensated for his litigation expenses." (*Santa Clara Valley Water Dist. v. Gross* (1988) 200 Cal.App.3d 1363, 1368 [246 Cal.Rptr. 580].) "Several factors have emerged as general guidelines for determining the reasonableness or unreasonableness of offers [in eminent domain cases]. They are ' "(1) the amount of the difference between the offer and the compensation awarded, (2) the percentage of the difference between the offer and award . . . and (3) the good faith, care and accuracy in how the amount of offer and the amount of demand, respectively, were determined." ' [Citation.] Thus, the mathematical relation between the condemner's highest offer and the award is only one factor that should enter into the trial court's determination. [Citations.]" (*Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 720 [66 Cal.Rptr.2d 630, 941 P.2d 809].)

Fallbrook contends that its final settlement offer of $900,000 was reasonable as a matter of law under Code of Civil Procedure section 1250.410 because it was greater than the jury's direct condemnation award of $872,560. Fallbrook maintains that the trial court should not have awarded Red Mountain all of its attorney and expert fees for the entire action without apportioning the award between the breach of contract claim, the inverse condemnation claim, and the direct condemnation action.[22] Red Mountain characterizes Fallbrook's argument as "disingenuous" because Fallbrook's final offer of $900,000 was a proposal to settle *both* the inverse *and* direct condemnation actions, and thus was less than half of the combined award of $2,337,488. Noting that an award of litigation expenses is required in an inverse condemnation action regardless of any final offer and demand, Red Mountain cites *Salton Bay Marina, Inc. v. Imperial Irrigation Dist., supra,* 172 Cal.App.3d at p. 958, for the proposition that the trial court has discretion not to apportion fees and costs attributable to an inverse condemnation claim when that claim is tried in conjunction with another claim.

---

[22] Fallbrook's position apparently is that the trial court should have awarded fees with respect to the inverse condemnation claim only.

The trial court effectively awarded fees and expenses under both statutes. It ruled that "[Red Mountain's] Motion for Recovery of Litigation Expenses pursuant to [Code of Civil Procedure section] 1036 and [Code of Civil Procedure section] 1250.410 on the grounds that [Red Mountain] prevailed on its inverse condemnation cause of action and is entitled to fees and expenses as a matter of law, that Red Mountain's final demands and settlement offers to compromise were reasonable and that [Fallbrook's] final offer and failure to negotiate were unreasonable, and that [Fallbrook] did not act with good faith, care and accuracy in its negotiations in dealing with Red Mountain, and that the amount of Red Mountain's litigation expenses are reasonable, is granted *in its entirety*." (Italics added.) The trial court thus impliedly found that Fallbrook's final offer of $900,000 was unreasonable under Code of Civil Procedure section 1250.410 as to the direct condemnation case because that offer encompassed a proposed settlement of the inverse condemnation case as well.

The trial court could reasonably find that Fallbrook's final offer to settle the *entire action* was unreasonable as to the direct condemnation case given the substantial difference between the offer and the compensation awarded Red Mountain for the entire action. Accordingly, it was not an abuse of discretion for the trial court to award litigation expenses for both the direct and inverse condemnation actions under Code of Civil Procedure sections 1250.410 and 1036 respectively. However, retrial of the inverse condemnation and breach of contract claims could result in either a finding of no liability for inverse condemnation and thus no damages, or a substantially lower award of damages than the inverse condemnation/breach of contract award in the first trial, and retrial of direct condemnation case could result in a higher award of just compensation. Depending on the outcome, the trial court might reasonably conclude that Fallbrook's final offer of $900,000 was reasonable with respect to the direct condemnation case, and decline to award litigation expenses under Code of Civil Procedure section 1250.410. If Red Mountain recovers inverse condemnation damages and the court finds Fallbrook's final offer was reasonable with respect to the direct condemnation case, Red Mountain would be entitled to recover litigation expenses only under Code of Civil Procedure section 1036 with respect to its inverse condemnation claim, and the trial court would have to apportion fees to exclude time spent on the direct condemnation case, unless it found that the two matters were sufficiently related to justify an award of litigation expenses as to both. Accordingly, we reverse the award of litigation expenses and remand the matter to the trial court for redetermination based on the outcome of the retrial.

## DISPOSITION

The judgment is reversed and the cause matter is remanded for retrial. The postjudgment order awarding Red Mountain litigation expenses under Code of Civil Procedure sections 1036 and 1250.410 is reversed and the matter is remanded for redetermination in light of the outcome of the retrial. The stay this court issued on September 8, 2004, is vacated. The parties shall bear their own costs on appeal.

Huffman, Acting P. J., and McIntyre, J., concurred.

Respondent's petition for review by the Supreme Court was denied December 20, 2006, S147913.