Filed 5/13/13  Guiboa v. Pepperidge Farm CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| JAMES M. GUIBOA, | B235102 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. PC044616) |
| v. | |
| PEPPERIDGE FARM, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Burt Pines, Judge.  Affirmed.

Law Offices of Todd D. Thibodo, Todd D. Thibodo and Ankur Tarneja; Benedon & Serlin, Gerald M. Serlin and Douglas G. Benedon for Plaintiff and Appellant.

Allen Matkins Leck Gamble Mallory & Natsis, Anthony J. Oliva and Andrew E. Miller for Defendant and Respondent.

Plaintiff James M. Guiboa appeals from a defense judgment in this case arising from a consignment agreement under which he distributed goods produced by defendant Pepperidge Farm, Inc. Guiboa argues the trial court erred in granting nonsuit on his cause of action for breach of the implied covenant of good faith and fair dealing and for punitive damages. He also challenges the sufficiency of the evidence supporting the jury's verdict that Pepperidge Farm was not required to pay him the fair market value of his distributorship following the termination of the consignment agreement for cause. He asserts that on remand, the jury should decide his cause of action for conversion and the court should decide his cause of action for unfair business practices under Business and Professions Code section 17200.

We find no basis for reversal and affirm.

## FACTUAL AND PROCEDURAL SUMMARY

Guiboa purchased a Pepperidge Farm distributorship route in 1975 from a third party and entered into a consignment agreement with Pepperidge Farm to distribute cookies and crackers within that defined, and exclusive, territory in southern California. As a Sales Development Associate (S.D.A.), Guiboa was an independent contractor. He received a 20 percent commission on gross sales within his territory.

Over the next 33 years, Guiboa's distribution territory for Pepperidge Farm changed, sometimes expanding through purchases of additional territory, and sometimes contracting due to the sale of portions of the territory to third parties. Pepperidge Farm had the right to approve the potential buyers of parts of Guiboa's territory. Each time the territory changed, Guiboa and Pepperidge Farm entered into a new consignment agreement. They entered into the last of these consignment agreements in December 2004 (the Agreement). It covered Guiboa's distribution territories in the San Fernando and Santa Clarita Valleys.

Paragraph 7 of the Agreement provided that if Guiboa failed to maintain satisfactory distribution service to any retail store within his territory "and such failure is not remedied within five days after written notice thereof from [Pepperidge Farm],

2

[Pepperidge Farm] may make other arrangements, on either a permanent or temporary basis in the discretion of [Pepperidge Farm], for the service of such store."

The Agreement provided for termination for cause, or without cause. Paragraph 17 set the terms for termination with cause upon written notice. Only the first two grounds for termination for cause are relevant here: (a) failure "adequately to realize the sales potential of the territory" and "failure to make satisfactory improvement within thirty days after notice of inadequacy", and (b) failure to perform or comply with any material terms of the Agreement and the continuance of such failure for seven days after written notice from Pepperidge Farm. Paragraph 17 concluded: "Termination pursuant to this paragraph shall operate to release all rights and obligations hereunder of both [Pepperidge Farm] and [Guiboa] except the right to receive any favorable balances and the obligation to pay any adverse balances." No provision for payment of the value of Guiboa's territory was included in paragraph 17.

Paragraph 18 of the Agreement stated the terms for termination without cause. Pepperidge Farm was given the right in its discretion to terminate the Agreement at any time without cause upon written notice. A procedure was provided for determining the fair market value of the franchise and payment to the distributor: "Upon termination pursuant to this paragraph [Pepperidge Farm] will pay to [Guiboa] a sum equal to the fair market value of this franchise on the termination date plus 25% of such value, such value to be determined either by agreement between [Pepperidge Farm] and [Guiboa] or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by [Pepperidge Farm] and one by [Guiboa] and the third by the two first chosen." Paragraph 18 concluded: "Termination pursuant to this paragraph shall operate to release all rights and obligations hereunder of both [Pepperidge Farm] and [Guiboa] except (a) the right to receive any favorable balances and the obligation to pay any adverse balances and (b) the rights and obligations with respect to payment and arbitration stated in this paragraph."

Beginning in February 2007, Pepperidge Farm received complaints from customers (stores in Guiboa's territory) about poor service. Pepperidge Farm conducted store audits. Based on a total of 56 separate failed audits, it sent Guioba a series of 24

3

"5-day letters" directing him to cure identified deficiencies within 5 days. In May, July, and October 2008, Pepperidge Farm sent Guioba "Business Development System" or "B.D.S." letters outlining the serious problems being experienced within Guiboa's territory. Each letter warned that failure to resolve the problems could result in termination of Guiboa's Agreement for cause. In addition, each time a B.D.S. letter was issued, Pepperidge Farm managers met with Guiboa in an effort to resolve the service problems.

After the October 2008 B.D.S. letter was sent, new audits were conducted of several stores within Guiboa's territory. Based on continuing service deficiencies, on November 14, 2008, Pepperidge Farm notified Guiboa that his agreement had been terminated for cause. Pepperidge Farm marketed Guiboa's territory for sale, as a single route, broken into five separate territories. Although no buyer was found for the entire territory, by October 2010, all five pieces of the territory had been sold for a total of $1,382,087.25. He never brought any prospective buyers for his territory to Pepperidge Farm. All sale proceeds went to Guiboa.

Guiboa sued Pepperidge Farm, alleging causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, unfair business practices under Business and Professions Code section 17200, and for declaratory relief.[1] After Guiboa rested at the jury trial, Pepperidge Farm moved for nonsuit on the causes of action for conversion, breach of the implied covenant of good faith and fair dealing, violation of Business and Professions Code section 17200, and the claim for declaratory relief.[2] The trial court deferred ruling on the motion until the close of Pepperidge Farm's case. It then granted nonsuit on the cause of action for breach of the implied covenant of good faith. It also ruled that there was insufficient evidence of oppression, fraud, or

---

[1] Guiboa's causes of action for libel and slander were withdrawn before trial. In addition, Ronald Woolsey, a Pepperidge Farm manager, was dismissed as a defendant.

[2] During argument on the nonsuit motion, Guioba agreed to dismissal of his declaratory relief cause of action.

malice to allow the claim for punitive damages, but denied the motion as to the conversion cause of action. It deferred ruling on the unfair business practices claim.

The jury deliberated on Guiboa's causes of action for breach of contract and conversion. It rendered a special verdict in favor of Pepperidge Farm. Answering the first two questions on the special verdict form, the jury found that Pepperidge Farm had terminated the Agreement for cause, and that it was not required to pay Guiboa the fair market value of the distribution territory. At that point, the verdict form directed the jury not to answer the remaining questions, and to have the foreperson sign and date the form. The unanswered questions asked the jury to determine the fair market value of the distributorship as of the date of termination, whether Pepperidge Farm was liable for conversion, and if so, Guiboa's damages for conversion. The trial court then determined that Guiboa was not entitled to equitable relief under Business and Professions Code section 17200. Guiboa's motions for judgment notwithstanding the verdict and for new trial were denied. Judgment for Pepperidge Farm was entered and this timely appeal followed.

## DISCUSSION

### I

Since the trial court deferred ruling on Pepperidge Farm's motion for nonsuit until both sides had rested, its ruling was technically a directed verdict. It is a distinction without substance because like a nonsuit, a motion for directed verdict is in the nature of a demurrer to the evidence. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629.) "A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party. [Citations.]" (*Id*. at pp. 629–630.) The trial court

5

considering such a motion has no power to weigh the evidence and may not consider the credibility of the witnesses. (*Id*. at p. 629.)

On appeal, "we review the evidence in the light most favorable to the plaintiff, resolving all conflicts and drawing all inferences in its favor and disregarding conflicting evidence. [Citations.] We must reverse the judgment if substantial evidence exists that would tend to prove each of the elements of the plaintiff's case. [Citation.]" (*Wolf v. Walt Disney Pictures and Television* (2008) 162 Cal.App.4th 1107, 1119.)

II

We begin by clarifying which matters are not appealed by Guiboa. He does not challenge the sufficiency of the evidence supporting the verdict for Pepperidge Farm on the cause of action for breach of contract. He "does not contest that substantial evidence supports the jury's finding that he was terminated for cause." But he contends that this concession is not a sufficient basis for nonsuit on his claim for breach of the implied covenant of good faith and fair dealing.

Guiboa argues that his breach of the implied covenant should have gone to the jury based on Pepperidge Farm's conduct after the Agreement was terminated. His position is that the territory itself had a market value since he had the exclusive right to distribute within that geographic area. He contends that upon termination for cause, Pepperidge Farm should have paid him the fair market value of the territory immediately, and then sold it when able to do so to offset the sum paid to him. Based on these assumptions, he asserts that Pepperidge Farm deprived him of the benefits of the Agreement by "(1) taking Guiboa's distributorship, (2) failing to immediately, or—at minimum—within a reasonable time, pay Guiboa upon termination of the Consignment Agreement, (3) retaining Guiboa's funds for its own use, (4) obtaining the time benefit of Guiboa's funds before selling the distributorship, (5) keeping the commissions on the sales within Guiboa's territory, (6) breaking up Guiboa's distributorship, which reduced its value and the ease with which it could be sold, (7) failing to communicate with Guiboa about the sale of [the] distributorship, and (8) tying Guiboa's payment to the ultimate sales price

6

received for [the] distributorship territories, an amount which declined due to our nation's recession, and a risk which Pepperidge Farm unilaterally imposed on Guiboa."  In support, Guiboa cites a passage from *R.J. Kuhl Corp. v. Sullivan* (1993) 13 Cal.App.4th 1589, 1602 quoting comment (d) to the Restatement 2nd of Contracts, section 205:  "'Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified.  But the obligation goes further:  bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions:  evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.'"

"'"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." (Rest.2d Contracts, § 205.)'" (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371 (*Carma*).)  "A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable. [Citations.]" (*Ibid.*)  "[B]reach of a specific provision of the contract is not a necessary prerequisite. [Citation.]  Were it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract." (*Id*. at p. 373, fn. omitted.)  But the Supreme Court in *Carma* recognized that the express terms and purposes of the contract circumscribe the scope of conduct prohibited by the covenant of good faith.  (*Ibid.*)  It said:  "As explained in *Foley* [*v. Interactive Data Corp.* (1988) 47 Cal.3d 654], under traditional contract principles, the implied covenant of good faith is read into contracts '*in order to protect the express covenants or promises of the contract*, not to protect some general public policy interest not directly tied to the contract's purpose.' (*Foley*, *supra*, 47 Cal.3d at p. 690.)" (*Ibid*, italics added.)  "The covenant of good faith and fair dealing was developed in the contract arena and is aimed at making

7

effective the agreement's promises.'" (*Id*. at p. 373, fn. 13, quoting *Foley*, *supra*, 47 Cal.3d at p. 683.)

In *Carma*, the Supreme Court observed that it was "aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms. [Citations.]" (*Carma*, *supra*, 2 Cal.4th at p. 374.) The *Carma* court cited with approval *Gerlund v. Electronic Dispensers International* (1987) 190 Cal.App.3d 263, which arose in the context of termination of a sales representative agreement. The contract expressly provided that the agreement was to be effective until thirty days after notice of termination given by either party, and that notice of termination could be given at any time and for any reason. (*Id*. at p. 268.) The Court of Appeal held that it was reversible error to instruct the jury that it could apply an implied covenant of good faith and fair dealing to override an express provision of the contract. (*Id*. at p. 277; see also *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1061–1062, 1064 [holding a freely negotiated lease provision allowing either party to terminate the lease for any reason within a particular time frame must be given effect and that it could not be read "out of the lease simply because one party feels its operation was harsh or unfair"].) In *Carma*, the court reasoned that the covenant of good faith could not be read to prohibit Marathon from exercising its express contractual right to terminate the lease upon notice of intent to sublease or assign. It held that there was no breach of the implied covenant because Marathon's termination of the lease in order to claim the appreciated rental value for itself was expressly permitted by the lease and was clearly within the parties' reasonable expectations. It concluded: "In our view, such conduct can never violate an implied covenant of good faith and fair dealing." (2 Cal.4th at p. 376, fn. omitted.)

"Because the covenant of good faith and fair dealing essentially is a contract term that aims to effectuate the contractual intentions of the parties, 'compensation for its breach has almost always been limited to contract rather than tort remedies.' [Citations.] At present, this court recognizes only one exception to that general rule: tort remedies

8

are available for a breach of the covenant in cases involving insurance policies. [Citations.]" (*Cates Construction, Inc. v. Talbot Partners* (21 Cal.4th 28, 43; see also *Food Safety Net Services v. Eco Safe Systems USA, Inc.* (2012) 209 Cal.App.4th 1118, 1127.)  Guiboa did not seek tort damages for breach of the implied covenant.

Guiboa's claim that Pepperidge Farm breached the covenant by taking his distributorship is undercut by his concession that there was substantial evidence to support the jury's verdict that Pepperidge Farm had cause to terminate the Agreement.  In light of that concession, he cannot attempt to impose liability on Pepperidge Farm for taking action expressly within the terms of the Agreement.  His argument that he retained the exclusive territory after the termination for cause, and that no one else had a right to service that territory until he was paid, is undercut by the express terms of paragraph 7 of the Agreement.  It provided that if Guiboa failed to remedy any failure to maintain satisfactory distribution service to any retail store within his territory within five days of written notice from Pepperidge Farm, it "may make other arrangements, on either a permanent or temporary basis in the discretion of [Pepperidge Farm], for service of such store."  Guiboa's failure to remedy the distribution failures within his territory was the basis for his termination for cause.  Under those circumstances, Pepperidge Farm had the right to permanently make other arrangements for distribution of its products to the stores within his territory.

Guiboa attempts to base a breach of the implied covenant on other actions of Pepperidge Farm.  But the evidence established that Pepperidge Farm's conduct was allowed by the applicable terms of the Agreement.  Since Guiboa does not contest that he was terminated for cause, this case comes within paragraph 17 of the Agreement, rather than paragraph 18, which provided for termination without cause.  Two primary aspects of paragraph 17 are relevant to our analysis.  The first impacts Guiboa's arguments regarding payment for his territory.  Paragraph 17 imposes no obligation on Pepperidge Farm to sell Guiboa's territory and pay him the proceeds.  In contrast, paragraph 18 calls for payment to Guiboa of the fair market value of his territory.  In the event that Guiboa and Pepperidge Farm could not agree on that value, paragraph 18 sets out a procedure to

9

select arbitrators who would make that determination. (Ex. 1, ¶ 18.) This ambiguity was the subject of much discussion at trial. Guiboa acknowledged both at trial and in his briefs on appeal that there is no express language in paragraph 17 requiring Pepperidge Farm to pay him the proceeds of the sale of the territory. Instead, he relies on a statement at trial by counsel for Pepperidge Farm that it was obligated to pay Guiboa the value of the territory if the Agreement was terminated for cause, and if terminated without cause, to pay 125 percent of the value. Interestingly, the jury found that Pepperidge Farm was not "'required to pay James Guiboa the fair market value of the distributorship following termination for cause.'"

Nonetheless, it is undisputed that Pepperidge Farm sold Guiboa's territory and sent him the proceeds of $1,382,087.25. Guiboa acknowledges that paragraph 17 of the Agreement did not state when payment would occur, which is understandable since there is no payment provision at all in that paragraph. Guiboa argues that where no express provision is made, under Civil Code section 1657, performance must be either immediate, or within a reasonable time.[3] Since sale of the territory was required, we conclude that immediate performance was not possible. Guiboa cites no provision of the Agreement obligating Pepperidge Farm to pay him for the territory immediately before it was sold to other distributors and we have found none. In granting nonsuit (or directed verdict) on the implied covenant claim, we infer that the trial court found that Pepperidge Farm's efforts to sell the territory and pay the proceeds to Guiboa occurred within a reasonable time.

This conclusion is supported by extensive evidence of Pepperidge Farm's efforts to market Guiboa's territory. Guiboa complains that the territory was broken into five pieces, thus reducing its value, and that he was not paid for the final piece until October

[3] Civil Code section 1657 provides: "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed. If the act is in its nature capable of being done instantly—as, for example, if it consists in the payment of money only—it must be performed immediately upon the thing to be done being exactly ascertained."

10

2010, nearly two years after the Agreement was terminated. But witnesses for Pepperidge Farm, who were directly involved in the sale of Guiboa's territory, testified to extensive sales efforts.

John Lucas, Director of Retail Operations, oversaw nine district sales managers, including Will Werther, who supervised Guiboa. He testified that after termination of the Agreement, Guiboa's territory was marketed both as a single territory and as five separate territories. He said that for the first time, Pepperidge Farm spent $20,000 on a billboard off of Interstate 5 to advertise the sale. It also held several open houses in Los Angeles, conducted marketing blitzes in the field by distributing fliers about the territory, and placed advertisements in newspapers like the Los Angeles Times. The open houses were advertised in the newspaper. A hotel room was rented, maps of the territories put up, and orientation about Pepperidge Farm distributorships was provided. Pepperidge Farm would have been willing to accept a purchaser for the entire territory but none came forward. Two extremely low offers at a ratio of 20 or 21 times average weekly sales were rejected. To Lucas' knowledge, Guiboa never presented a prospective buyer to Pepperidge Farm.

Ron Woolsey, Customer Vice President of the West Region, also testified that Pepperidge Farm marketed Guiboa's territory both as a single parcel and as five. He said the territory was marketed as five parcels to give the best chance of sales. The first check was sent to Guiboa for sale of one part of the territory in June 2009. Although Guiboa sought a sales price of 55 times the weekly average sales in his territory, no offer at this price was received. In a first for Pepperidge Farm, it arranged with its parent company for financing for three buyers of parcels of Guiboa's territory in order to complete the sales.

Kyle Jordan, Director of Distributor Development for Pepperidge Farm, had overseen 2,500 route sales transactions for the company. He also described the marketing of Guiboa's territory, including use of the billboard and subsidized down payments for the first time. He testified that Guiboa's territory sold for an amount above the San Fernando Valley average ratio, which translated to $42,000 over fair market

11

value.  Will Werther, Guiboa's District Sales Manager, testified that Pepperidge Farm advertised the five pieces of the territory on a website for marketing distributorships.

This evidence supports a conclusion that Pepperidge Farm acted reasonably in marketing and selling Guiboa's territory, within a reasonable time after the termination of the Agreement.  Guiboa failed to present evidence which would have supported judgment in his favor under the implied covenant theory on his claims related to the marketing and timing of the sale of his former territory.

As we have discussed, paragraph 17 of the Agreement provides that upon termination, all rights and obligations of both Guiboa and Pepperidge Farm are released, except the right to receive any favorable balances and the obligation to pay any adverse balances.  Under these terms, Guiboa had no continuing right to commissions on sales within his former territory, as he claims.  Guiboa also argues Pepperidge Farm breached the implied covenant by failing to communicate with him about the sale.  But neither paragraph 17, or any other provision of the contract, imposed that duty on Pepperidge Farm.

Finally, Guiboa claims Pepperidge Farm breached the implied covenant by "tying Guiboa's payment to the ultimate sales price received for the distributorship territories, an amount which declined due to our nation's recession, and a risk which Pepperidge Farm unilaterally imposed on Guiboa."  If it is an argument that the sale was improperly delayed until the national recession impacted the value of the territory, we have already found that Pepperidge Farm did not breach the covenant in either the extent or timing of its marketing efforts.  We conclude that nonsuit on the breach of implied covenant cause of action was proper.

II

Guiboa also argues the jury erred in finding that Pepperidge Farm was not required to pay him the fair market value of his distributorship following termination for cause.

12

"The most fundamental rule of appellate review is that a judgment is presumed correct, all intendments and presumptions are indulged in its favor, and ambiguities are resolved in favor of affirmance. [Citations.] Where appellants challenge the sufficiency of the evidence we defer to the trial court. Our review is limited to whether there is any substantial evidence contradicted or uncontradicted that will support the challenged factual finding. [Citation.]" (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286.)

The evidence is that Guiboa was paid for his territory by Pepperidge Farm. Having received that payment, despite the jury's finding that there was no obligation to make it, we see no harm to Guiboa and hence no basis for reversal. (See *Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 347–348 ["appellant has the burden to show not only that the trial court erred but also that the error was prejudicial. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105.)"].) "Error is prejudicial if it is reasonably probable that a result more favorable to the appellant would have been reached absent the error. [Citations.]" (*Id*. at p. 348.) Guiboa has not demonstrated a right to any payment in addition to what he received. No prejudice is shown.

III

Guiboa argues that on remand, the jury should resolve whether Pepperidge Farm is liable to him for conversion. This argument presupposes that Guiboa will prevail on his argument that the judgment would be reversed because the trial court improperly granted nonsuit. We have rejected that argument and see no basis for remand. This argument therefore is moot.

IV

Guiboa argues the trial court erred in granting nonsuit on his claim for punitive damages, because this was not a ground raised in Pepperidge Farm's motion, and the trial court did not have the authority on its own to grant the motion on a new ground. It is

unclear under California law whether a trial court has the power to grant nonsuit or directed verdict on a ground not raised by the moving party. (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2012) [¶] 12:352 to 12:356, pp. 12–70 to 12–71.) But the error, if any, was harmless since Guiboa had no viable tort cause of action on which punitive damages could be based.

As we have noted, Guiboa makes it clear that his claim for breach of the implied covenant of good faith and fair dealing was for contract rather than tort damages. "Claims for breach of the implied covenant of good faith and fair dealing may sound in either contract or tort, depending on the remedies being sought. A *contract claim limits the plaintiff to contract remedies only*, while a tort claim permits recovery of noncontract damages, such as emotional distress, punitive damages, and attorney's fees. (*Archdale v. American Internat. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 467, fn. 19.)" (*Blue Shield of California Life & Health Ins. Co. v. Superior Court* (2011) 192 Cal.App.4th 727, 730, fn. 1, italics added.) A claim for punitive damages thus could not be based on the implied covenant claim.

We also have rejected Guiboa's argument that on remand, the jury should determine his right to damages for conversion since we are not remanding. The conversion cause of action was the only other possible basis for an award of punitive damages. Thus even though Pepperidge Farm did not seek nonsuit on the punitive damages claim, we conclude that Guiboa has failed to carry his burden of proving this error was prejudicial on this record. (See *Red Mountain, LLC v. Fallbrook Public Utility Dist.*, *supra*, 143 Cal.App.4th at pp. 347–348.)


V

Guiboa argues that upon remand, the court should resolve whether he is entitled to an award based on Pepperidge Farm's unfair business practices. As we have explained, there is no basis for remand. Guiboa's argument is that while Pepperidge Farm had the unilateral right to terminate the Agreement, it did not have the right to exercise dominion

14

over the distributorship "unless it abided by its concomitant duty of paying Guiboa immediately for his distributorship or doing so within a reasonable period of time."

The complaint alleged the following unfair business practices: that Pepperidge Farm actually terminated the Agreement without cause but stated pretextual grounds for termination with cause to avoid paying compensation under paragraph 18 ([¶] 69 of complaint); that Pepperidge Farm libeled and slandered Guiboa ([¶] 70 of complaint); and that Pepperidge Farm converted Guiboa's distributorship to its own use without any compensation ([¶] 71 of complaint). The trial court found that Guiboa had no basis for recovery under Business and Professions Code section 17200 because termination was with cause, a point now conceded by Guiboa; the libel and slander claims were withdrawn and were not part of the evidence at trial; and Guiboa's right to possess and distribute Pepperidge Farm products was extinguished upon termination of the Agreement for cause under paragraph 17.

We agree with the trial court's reasoning. None of these grounds has continuing viability. The termination was for cause, the defamation claims were dismissed, and the jury did not reach the conversion cause of action as directed by the special verdict form.

## DISPOSITION

The judgment is affirmed. Pepperidge Farm is to have its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.                    SUZUKAWA, J.

15