Filed 5/30/23  C.S. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| C.S. et al., | |
| Petitioners, | E080818 |
| v. | (Super.Ct.Nos. J290945, J090946,) J290947 & J294367) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | |
| Respondent; | OPINION |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Steven A. Mapes, Judge.  Petition denied.

Serobian Law, Inc., Liana Serobian for Petitioner C.S.

Moore & Associates, Dennis Moore for Petitioner N.C.

No appearance for Respondent.

1

Tom Bunton, County Counsel, David Guardado, Deputy County Counsel for Real Party in Interest.

C.S. (Mother) petitions for extraordinary writ review of an order setting a hearing under Welfare and Institutions Code section 366.26. (Welf. & Inst. Code, §§ 366.26, subd. (*l*) [unlabeled statutory citations are to this code]; Cal. Rules of Court, rule 8.452.) N.C. (Father) joins in Mother's petition.

At the jurisdiction and disposition hearing, the juvenile court took jurisdiction over the parents' children under section 300, subdivisions (a), (b), (e), and (j). The court then removed the children from the parents' custody, denied the parents reunification services, denied them visitation, and set the section 366.26 hearing. Mother challenges the sufficiency of the evidence supporting the jurisdictional findings, the removal order, and the visitation order. She also argues that the court violated section 361.3 by failing to give preferential consideration to relatives' requests for placement. We conclude that Mother's arguments lack merit, and we accordingly deny the petition.[1]

BACKGROUND

I. *Referral and Detention*

The family came to the attention of San Bernardino County Children and Family Services (CFS) in October 2021. CFS received a referral alleging physical abuse of the

---

[1] Before Mother filed her writ petition, she requested a stay of the section 366.26 hearing, which is scheduled for June 12, 2023. We denied that request for a stay on April 6, 2023. Mother's petition again asks us to stay the section 366.26 hearing. We deny the second request for a stay, as Mother has not made "an exceptional showing of good cause." (Cal. Rules of Court, rule 8.452(f).)

parents' three-week-old daughter, A.C. A.C. had been admitted to the hospital and had parietal bone fractures on both sides of her skull, subdural hematomas on both sides of her head, microhemorrhages in her brain, three "'corner fractures'" on her right leg, and subconjunctival hemorrhaging in her eye. According to Dr. Komal Aziz, who performed A.C.'s forensic exam, corner fractures are caused by pulling or twisting. Subconjunctival hemorrhaging usually is caused by applying pressure to the chest or squeezing the chest of the child. Dr. Aziz opined that A.C.'s injuries were caused by blunt force trauma, shaking, and/or falling from a significant height.

The social worker interviewed Mother and Father separately, and both parents said that they did not know how A.C. was injured. They denied harming the child or dropping her. The family lived with the maternal grandparents, but the parents had not left A.C. alone with the maternal grandparents. The parents reported that five days ago, they noticed a bump on the child's head. The next day, Mother noticed redness in the child's eye and on the side of her face. The day after that, the parents took the child to her pediatrician, who advised them to take A.C. to the emergency room as soon as possible. The parents took A.C. to the emergency room the following evening, after Father got home from work. Mother reported that she did not take the child earlier because Father had to work and could not drive them, but she acknowledged that she had a driver's license and another car at home.

A deputy with the San Bernardino County Sheriff's Department also interviewed the parents. Mother denied harming A.C. and denied any knowledge of others harming

3

the child. Father initially denied harming A.C. and denied knowing the cause of her injuries. But after further questioning, he reported that he dropped the child. He said that he lost his grip on her head when he was holding her, and her head hit a chair. The deputy recorded father reenacting the scene with a doll and showed the video to Dr. Aziz. According to the doctor, A.C.'s injuries were not consistent with Father's explanation.

CFS asked the parents to bring their two other children, five-year-old A.A. and one-year-old E.C., to the hospital for assessment. E.C.'s x-rays showed fractures to the back of her ribs, which were indicative of pressure applied through squeezing. A.A. had no injuries. The court issued a protective custody warrant to detain the children, and CFS placed them with a relative on an emergency basis.

CFS filed petitions alleging that A.C. and E.C. were described by subdivisions (a), (b), (e), and (j) of section 300 and that A.A. was described by subdivisions (a) and (j) of section 300. The petitions alleged that A.C. and E.C. had suffered physical abuse while in the parents' care, the parents failed to protect the children from physical abuse, and the parents failed to provide them with necessary medical treatment. As to A.A., the petition alleged that he was at substantial risk of physical abuse.

In October 2021, the court detained the three children from the parents. The court found that visitation with Father would be detrimental to the children and denied Father visitation, but it ordered weekly two-hour visits for Mother.

4

II. *Jurisdiction and Disposition Report and Addenda*

When CFS interviewed the parents for the jurisdiction and disposition report, Father said that neither he nor anyone in his home caused A.C.'s injuries. Father claimed that he never told the deputy that he lost hold of A.C.'s head and dropped her, and he called that account "'another lie of the investigation.'" He believed that the child's injuries were the result of a genetic condition that causes "'weak bones.'" He said that the same genetic condition caused the injuries to E.C. and that tests showed E.C. had the condition. He explained that the parents did not take A.C. to the emergency room immediately after they saw her pediatrician because the car was not safe and "'needed some arrangements,'" and a nurse told them it was fine to take the child the next day.

Mother likewise reported that no one in the home had physically abused the children. She said that the parents had done their own investigation, and they believed that the children suffered from osteogenesis imperfecta, a genetic disorder affecting the bones. She explained that E.C. was born with a fracture, and Mother had a report showing that the fracture occurred in the womb or at birth. Mother said that she would provide documentation showing that the condition was genetic. She reported that A.C.'s pediatrician did not tell the parents to take the child to the emergency room immediately—the doctor said to go "'when [they] have time or later on.'"

A.A. spoke with a forensic interviewer. The child disclosed that Father hits E.C. with his hand, causing her to cry "'a lot.'" Mother fights and gets angry with Father when he hits E.C. A.A. disclosed that Father also hits A.A. with his hand.

CFS obtained Dr. Aziz's forensic consultation notes for A.C. and E.C. The doctor concluded that A.C.'s injuries were most consistent with abusive head trauma and physical abuse. As for E.C., the doctor noted that the healing fractures on her ribs were typically caused by squeezing or compression of the rib cage or direct blows. Given that the parents did not provide any history to explain those findings, the doctor concluded that E.C.'s injuries were highly suspicious for physical abuse. E.C.'s head CT scan also showed a focal deformity that could represent a remote skull fracture. That was consistent with Mother's report that E.C. had a skull fracture around the age of one and one-half to two months. Both parents denied a family history of fragile or easily broken bones.

CFS also obtained the deputy's written report of his interviews with the parents. The interviews were audio and video recorded. During the first 40 minutes of the interview, Father denied knowing how A.C. sustained her injuries. He eventually stated that A.C. slipped from his hands as he was carrying her to her crib. She hit the left side of her head on the crib, but he was able to maintain his grasp on her legs. Mother was asleep in the same room when the incident occurred and awoke when the child began to cry after hitting the crib. Father gave the child to Mother for feeding and did not tell Mother what had happened.

CFS referred E.C. for genetic testing. According to the geneticist's report, "[n]o clinically relevant alterations [were] detected." E.C.'s testing revealed a single variant of "uncertain clinical significance" in a particular gene. Pathogenic variants in that gene

6

were associated with a bone disorder called autosomal recessive osteopetrosis type 7. Even if the variant identified in E.C.'s gene were reclassified to pathogenic in the future, E.C. would be considered only a carrier of the condition. The geneticist determined that the single variant of uncertain clinical significance was "not expected to explain [E.C.'s] history of fractures." If testing had identified an underlying genetic diagnosis for E.C.'s history of fractures, then the lab would have conducted testing on A.C., given that the children were "full sisters with a similar clinical history." But because E.C.'s results did not identify anything, A.C. did not undergo testing. Dr. Aziz reviewed E.C.'s genetic testing results and reported that they did not change the doctor's forensic opinion.

Mother's visits with the children initially went well, and CFS reported no safety concerns. CFS had moved the children from a maternal cousin's home to a foster care placement with nonrelatives, and the caregiver was supervising visits. At a recent visit, A.A. did not want the caregiver to leave when she dropped him off; he asked the caregiver how long she would be gone, where she was going, and when she would be back. He hugged her tightly and stood close to her as she tried to leave. The social worker had to distract A.A. so that the caregiver could slip out. The caregiver reported that A.A. became emotional and anxious when visits approached. The child told her that he felt bad about the visits because he did not want to go, and he was worried that the parents would take him back to their house.

The caregiver was also concerned that Mother had been bringing family members to visits, and the caregiver did not feel comfortable supervising that many people. The

social worker advised Mother that she could have one family visit per month with up to five family members present. Mother became argumentative with the social worker and asserted that CFS was violating the children's rights by imposing such a limitation. She also argued that the limitation should not apply in this case, because she had never signed a supervised visitation agreement prohibiting her from bringing relatives.

Several weeks later, the social worker agreed to supervise a family visit at the CFS office, where Mother would be permitted to have a birthday party for E.C. The worker agreed that Mother could invite a certain number of relatives. Mother arrived two hours early for that visit and demanded that security allow her into the office to decorate for the party. She was hostile with security and office staff until the social worker let her in, right before the appointed time. Approximately 30 people arrived for the party, many more guests than the social worker had approved. Mother set up speakers and was playing loud music. E.C. appeared to be afraid of the large crowd and loud music, and the child frequently ran to her caregiver. During the party, a maternal aunt spoke to A.A. about the case and promised the child that he would be living with her soon. He told the caregiver that he was upset he might have to leave her home and live with the maternal aunt.

Both parents engaged in predisposition services consisting of a 12-week parenting course, a 12-week anger management program, and eight therapy sessions. The social worker noted that despite completing those services, the parents continued to deny responsibility for the injuries to the children. The worker also noted the children had not

8

suffered any further injuries since they had been in CFS's care. According to the report from Father's therapist, he could not "accept responsibility for the injuries to his daughters," and Father maintained that a genetic disorder caused their injuries. Similarly, Mother's therapist reported that Mother denied any physical abuse and was seeking an expert physician to explore possible genetic issues.

III. *Detention of the Parents' Newborn Child*

Mother gave birth to another daughter, Ei.C., in August 2022. On the basis of the injuries to Ei.C.'s siblings, CFS determined that Ei.C. was also at risk of physical abuse. The social worker for Ei.C.'s case contacted Mother and told her that CFS would be seeking a detention warrant for Ei.C. Mother said that she would cooperate, but she insisted that CFS was wrong about the children being abused. She also insisted that the social worker for the other children's case had lied about the genetic testing.

The detention report for Ei.C. stated that according to "collaterals," Mother told family members that she would take the children to Mexico if the juvenile court failed to return the children to her custody. When the social worker executed the detention warrant, the maternal grandfather gave her genetic testing results for Mother, E.C., and A.C. The social worker said that she would give the information to the appropriate people, and the grandfather said that it had already been provided to the attorneys and a previous social worker.[2]

_____

[2] The social worker did not attach the genetic testing results to Ei.C.'s detention report. But maternal grandfather later filed a section 388 petition and attached genetic testing results to that petition. Those results showed that A.C., E.C., and Mother had the same variant in the gene identified by CFS's testing. And consistent with CFS's testing,

9

CFS filed a petition alleging that Ei.C. was described by section 300, subdivision (j), because her siblings were physically abused while in the parents' care. In September 2022, the court detained Ei.C. from the parents, ordered weekly two-hour visits for Mother, and denied Father visitation. At the first scheduled visit with Ei.C., Mother refused to sign the supervised visitation agreement, so the visit did not occur.

IV. *Further Addenda to the Jurisdiction and Disposition Report*

Around September 2022, the children's caregiver reported more concerns with visitation. A.A. became moody when visits were approaching. He often did not want to attend them, and he cried when it was time to leave for visits. He said that he was worried about being "'sent back.'" In addition, A.A. almost never mentioned Father to the caregiver. At a recent visit, Mother asked him to decorate a sign for Father's birthday, and the child's demeanor changed—he shut down and was sulky for the remainder of the visit. His caregiver also reported that A.A. had an extreme fear response to any sort of violence, whether the violence was on television or merely "rough play" with other children. For instance, A.A. had a panic attack when one of the caregiver's children pretended to be hurt, even after it became clear that the child was pretending. He also had panic attacks when the possibility of getting in trouble arose, like when the

---

the results stated that the variant was of uncertain significance, meaning that it was "not known to cause increased risk for a specific condition." The record in this writ proceeding does not contain the exhibits admitted at the contested jurisdictional and dispositional hearing, but it does not appear that the testing results were admitted into evidence.

caregivers caught him in a lie or told him not to do something. The caregivers had never raised their voices with him.

At a pretrial conference in September 2022, the children's counsel asked that the court find further visitation with Mother to be detrimental. The court permitted Mother to testify regarding the recent visitation reports. Mother testified that she asked A.A. what he wanted to do for Father's birthday, and she gave him several options. The child chose to decorate a sign, but it was not true that his demeanor changed after that. On another occasion, A.A. asked to see his new sister, Ei.C. Mother showed him two pictures on her phone in which Father was holding the baby. A.A. asked where Father was at almost every visit. Mother told the child that Father was working. She had never seen Father hit A.A. or the other children.

The court found that further visitation with Mother would be detrimental to the children and suspended her visitation. The court observed that it had already found visitation with Father to be detrimental, Father was the alleged perpetrator of abuse, and he was not supposed to have contact with the children. Yet Mother was doing things "with the kids to wrap him into" visits. The court concluded that Mother lacked protective capacity and that A.A.'s behavior showed visits were detrimental.

V. *Contested Jurisdiction and Disposition Hearing*

The contested jurisdiction and disposition hearing took place over the course of numerous days in October and November 2022 and February and March 2023. In the

following subparts, we summarize the relevant witness testimony and the juvenile court's findings and orders.

A.  *Dr. Aziz's Testimony*

The doctor was completing a three-year fellowship as a child abuse pediatrician. She started that fellowship roughly three months before she examined A.C. and E.C.  She was already a board-certified general pediatrician.  The doctor opined that A.C.'s injuries were caused by abusive head trauma and physical abuse, and there were multiple mechanisms of injury.  She also opined that E.C.'s injuries were caused by physical abuse.

A.C.'s skull fractures had characteristics that were consistent with inflicted injury, not accidental injury or injury from a short fall.  The fractures were also indicative of at least two impacts to the skull.  The skull fractures did not show signs of healing, so they were recent injuries.  The bleeding around the child's brain was significant and also appeared to be a recent injury.  In addition, A.C. had suffered injury to her brain tissue, which could lead to long-term consequences like developmental delays and neurocognitive deficits.  A.C. had subconjunctival hemorrhaging in her left eye and bruising on her left eyelid, which was consistent with blunt force impact to the eye.  The subconjunctival hemorrhaging could have been caused by squeezing the rib cage or blunt force impact.  The injuries to her eye and skull would have been caused by different impacts.  The types of fractures to A.C.'s leg are caused by a caregiver shaking a child so violently that their legs flail around, or by the caregiver pulling or twisting the leg

12

forcefully. Follow-up x-rays, which were done 10 days after the initial imaging, showed an additional fracture on A.C.'s right leg. The doctor opined that the additional fracture was not inflicted at the hospital because there was no history of trauma at the hospital that would explain it. The fracture was subtle, and it sometimes required imaging from different views to pick up such fractures.

Father did not tell Dr. Aziz that A.C. had slipped from his hands when the doctor talked to the parents about the child's history. She learned that information later from law enforcement. That concerned the doctor, because a protective, nonoffending parent typically does not hide information. Father's explanation did not provide a plausible cause of A.C.'s injuries. It would be highly unusual for a child her age to move so suddenly that she would slip out of her parent's hold. Also, Father described A.C. hitting one side of her head on the crib, but that did not explain the injuries on the other side of her head or a number of other injuries. To date, the parents had not provided a plausible explanation for A.C.'s injuries.

E.C.'s posterior lateral rib fractures were between two and four weeks old when the doctor examined the child. Dr. Aziz opined that those injuries were nonaccidental, given that the parents reported no history to explain them. Rib fractures in a child were highly specific for abuse when there was no well-documented reason for chest trauma. In particular, posterior lateral rib fractures are in a protected area of the rib cage and would be caused by adult-strength abusive force or something like a high-energy car collision.

13

The deformity on E.C.'s skull was a type of fracture that was a dent or indentation. A traumatic birth could cause that type of fracture. As far as the history for the skull fracture, Mother reported that she noticed the fracture when E.C. was one and one-half to two months old, and the child's doctor told Mother that it could have been caused by birth. Dr. Aziz reviewed E.C.'s medical records concerning the skull injury. The treating doctor's notes stated: "'I think this was probably related to birth issues, but, obviously, I cannot be sure about that.'"

After reviewing E.C.'s medical records, Dr. Aziz opined that it was very unlikely E.C.'s skull fracture was birth-related. There was no documentation of any trauma or complications during labor or delivery, nor was there documentation of any indentation in the child's skull at birth. Dr. Aziz concluded that E.C.'s skull fracture was consistent with physical abuse, because there was no history of birth trauma or another mechanism to explain the injury. The doctor explained that if caregivers provide no history to explain an injury, or they provide changing or inconsistent histories, then that commonly is indicative of inflicted trauma.

When Dr. Aziz interviewed the parents, both of them denied any family history of fractures (besides E.C.'s skull fracture), broken bones, bone problems, fragile bones, or an underlying disease or diagnosis that might cause fractures with minor trauma. An interpreter was not present when Dr. Aziz interviewed the parents. The doctor was aware that Mother was bilingual and that Father spoke Spanish, so she called for a Spanish

14

interpreter. But Mother told the doctor that she was comfortable speaking to the doctor in English, and Mother said that she could interpret for Father.

Dr. Aziz reviewed the genetic testing conducted in this case, and she did not believe that there was a genetic explanation for the children's injuries. The variant found in one gene was of uncertain significance, meaning that it was not linked to any known genetic disease or condition.

## B. *Dr. Thomas Grogan's Testimony*

The parents offered the expert testimony of Dr. Thomas Grogan, an orthopedic surgeon. Dr. Grogan opined that an impact with a flat surface, not shaking, caused the fracture on the right side of A.C.'s skull. The fractures on her right leg were caused by shaking or pulling on the limb. The hemorrhaging in her eye was caused by an increase in pressure from crying or vomiting, not shaking. A.C.'s skull fracture was three to five days old when the imaging was done, and her leg fractures were relatively new. The force required to cause such fractures in a three-week-old baby was about the same as needed to crush a soda can. E.C.'s rib fracture and skull fracture would have been caused by about the same amount of force. Dr. Grogan opined that it was unusual for siblings to have simultaneously suffered fractures with no history to explain them.

## C. *The Parents' Testimony*

Father testified that the children have a rare genetic mutation about which very little was known, and further testing was required to learn the significance of the mutation. Mother had ancestors who suffered sudden fractures with no apparent cause.

Father had never hit any of his children. The injuries to the children were the result of the genetic condition. Father could not point to anything in the normal handling of the children that would have caused the injuries. The parents were married, and Father intended to stay in a relationship with Mother.

Mother testified that she was unaware Father had told law enforcement that he dropped A.C. She did not believe that Father had dropped the child, and she did not know whether law enforcement was lying. She knew that Father did not cause the injuries to the children, and she believed that all of the children were safe in his care. Her daughters had bone dysplasia, so they could suffer bone fractures without application of a great deal of force. Mother told Dr. Aziz and many people at the hospital that her family had a history of bone problems. The birthing process in combination with the genetic condition caused all of A.C.'s and E.C.'s bone fractures. Mother could not say what had caused A.C.'s eye injury.

Mother said that she would not divorce Father because she wanted her family to stay together. But if the court returned the children to her, then she would live separately from him.

D. *Social Worker's Testimony*

The social worker spoke to "'collaterals'" who reported Mother's statements about fleeing to Mexico with the children. Those collaterals were the children's caregivers and family friends. One of the collaterals overheard the parents arranging to remove the children from the country in the event that the parents were not permitted to reunify with

them. The social worker told Mother that she could not give A.A. a cell phone, but Mother nevertheless tried to give him a phone with the location tracking enabled. The worker was concerned that it would be unsafe for Mother to know where the children were placed. The worker asked A.A. how he felt about visits, and the child said that visits "made his stomach feel funny," made him worry, and made him feel sad.

Mother had emailed the social worker numerous times, and the emails generally were inappropriate. In almost every email, Mother called the worker a liar, accused her of being biased, and accused her of hating Mother.

E. *The Court's Findings and Orders*

The juvenile court took jurisdiction over all four children. As to Ei.C., the court found true that her siblings were physically abused while in the parents' care, placing her at substantial risk of similar abuse. (§ 300, subd. (j).) As to A.A., the court found true that (1) he was at substantial risk of serious physical harm inflicted nonaccidentally by a parent (§ 300, subd. (a)), and (2) his siblings were physically abused while in the parents' care, placing him at substantial risk of similar abuse (§ 300, subd. (j)). And with respect to A.C. and E.C., the court found true that (1) they suffered serious physical harm inflicted nonaccidentally by a parent (§ 300, subd. (a)), (2) the parents failed to protect them from abuse and failed to provide A.C. with necessary medical treatment (§ 300, subd. (b)), (3) the children were under five years old and suffered severe physical abuse by a parent (§ 300, subd. (e)), and (4) a sibling was physically abused while in the parents' care, placing each child at substantial risk of similar abuse (§ 300, subd. (j)).

17

In explaining its jurisdictional findings, the court observed that there was a lack of evidence that the children's injuries were related to a genetic condition; the genetic testing showed only a variant of uncertain significance. There also was no evidence of any injuries since CFS had removed the children from the parents' custody. The court gave great weight to Dr. Aziz's testimony. The parents' own expert testified that A.C.'s skull injury was three to five days old, so the child did not sustain that injury during the birthing process, as Mother claimed. And according to the court, A.A.'s statements and his response to visits with Mother were also "telling" evidence. The court further relied on Father's statements to law enforcement describing how A.C. had slipped from his hands, which the court characterized as a "confession." The court did not credit the parents' claim that the pediatrician told them that they could delay in taking A.C. to the emergency room. The court instead concluded that the parents knew that the injuries would heal with time and the evidence thus would "dissipate."

With respect to disposition, the court declared the children dependents and removed them from the parents' custody. The court also denied the parents reunification services under section 361.5, subdivision (b)(5), (6), and (7), and it denied the parents visitation, finding that visitation would be harmful to the children's safety and/or emotional well-being. The court set a section 366.26 hearing to select a permanent plan for the children.

18

DISCUSSION

I. *Sufficiency of the Evidence Supporting the Jurisdictional Findings*

Mother argues that the record does not contain substantial evidence to support the court's jurisdictional findings. The argument lacks merit.

A challenge to the sufficiency of the evidence supporting a jurisdictional finding requires us to determine if substantial evidence, contradicted or not, supports it. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We draw all reasonable inferences from the evidence to support the finding and review the record in the light most favorable to the court's determination. (*Ibid.*) We do not reweigh the evidence or exercise independent judgment but merely determine whether the evidence is sufficient to support the finding. (*Ibid.*) Moreover, issues of credibility are the province of the juvenile court. (*Ibid.*)

Mother argues that the court's findings of physical abuse were not supported because the evidence shows both accidental and genetic causes of the children's injuries. She relies on Father's statements to law enforcement describing how A.C. slipped from his hands, the parents' repeated insistence that Mother had a family history of bone disorders, and the genetic testing showing a variant in one gene. She also asserts that the evidence shows A.C. and E.C. sustained new fractures while in the hospital.

But Mother ignores the ample evidence supporting the court's findings of physical abuse. A.A. disclosed during his forensic interview that Father hit A.A. and E.C. According to A.A.'s caregiver, the child had an extreme fear response to any sort of violence. Moreover, Dr. Aziz concluded that A.C. and E.C. were physically abused.

19

A.C.'s multiple injuries were caused by blunt force trauma, shaking, or pulling on the limb, and the injuries to different parts of her body indicated multiple mechanisms. The doctor determined that the child's injuries were not consistent with Father's description of how he dropped the child. His description of A.C.'s head hitting the crib did not explain why she had fractures on both sides of her head, nor did it explain the bruising on her eye or the hemorrhaging in her eye. And the court was not required to credit Father's claims in general. He did not report the dropping incident when Dr. Aziz interviewed the parents, he said that he did not know how A.C. was injured when CFS initially interviewed him, and he initially said the same thing to law enforcement. He offered the explanation for her injuries only after further questioning by the deputy. And he later attempted to recant his statements, describing them as a "'lie of the investigation.'" The court could reasonably conclude from Father's belated, inconsistent, and changing explanation that he had harmed A.C. in a nonaccidental manner.

As to E.C., substantial evidence contradicted Mother's claim that E.C. suffered her skull fracture during the birthing process. Dr. Aziz testified that there was no indication in the child's medical records of trauma or complications during birth, nor was there any indication that the child had the indentation in her skull at birth. The doctor who examined E.C. several months after birth stated only that the injury was probably related to birth, but the doctor could not be sure. And besides the claimed genetic condition, the parents offered no explanation for E.C.'s rib fractures, which were much more recent than the skull fracture.

20

As for the claimed genetic condition, the court reasonably concluded that the evidence did not support that explanation. The genetic testing showed a variant of uncertain clinical significance in one gene. The variant was not linked to any known genetic disease or condition. Both the geneticist and Dr. Aziz determined that the variant did not explain the children's history of fractures. The parents did not offer any medical evidence to support their claims that the children nevertheless suffered from a genetic bone disorder. They did not even mention that possibility when Dr. Aziz asked them about a family history of bone problems or fragile bones.

The record similarly does not support Mother's claim that the children suffered new fractures at the hospital. She asserts that E.C.'s rib fractures were new and could have been caused by handling at the hospital. But according to Dr. Aziz, the rib fractures were two to three weeks old when she examined E.C. Dr. Grogan, Mother's expert, did not say how old the rib fractures were. Dr. Aziz testified that follow-up imaging showed an additional leg fracture on A.C. 10 days after the initial imaging, but the doctor explained that multiple images were sometimes required to discover subtle fractures like that one. Thus, contrary to Mother's argument, it was not "evident" that handling by hospital staff caused fractures to the children.

In sum, Mother's challenge to the jurisdictional findings lacks merit. She fails to address the ample evidence supporting the court's findings and contradicting her claims.

II. *Sufficiency of the Evidence Supporting the Removal Order*

Mother argues that the record does not contain substantial evidence to support the dispositional order removing the children from her custody. More specifically, she contends that the evidence does not support the finding that there no were reasonable means to protect the children short of removal. We disagree.

To order a child removed from their parents' physical custody, the juvenile court must find by clear and convincing evidence that (1) there "would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child in the parents' home, and (2) "there are no reasonable means by which the [child's] physical health can be protected without" removal. (§ 361, subd. (c)(1).) A jurisdictional finding under subdivision (e) of section 300 constitutes prima facie evidence that a child cannot safely remain in the custody of a parent with whom the child resided at the time of injury. (§ 361, subd. (c)(1).)

Section 361 requires the court to consider two options as reasonable means to protect the child: (1) removing an offending parent from the home, and (2) allowing a nonoffending parent to retain physical custody, so long as that parent presents a plan showing that they can protect the child from future harm. (§ 361, subd. (c)(1)(A)-(B).)

We review the court's removal order for substantial evidence (*In re R.T.* (2017) 3 Cal.5th 622, 633), taking into account the level of confidence that the "clear and convincing" standard demands (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995). The question before us "is whether the record as a whole contains substantial evidence from

which a reasonable fact finder could have found it highly probable that the fact was true." (*Id.* at pp. 995-996.) We "view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at. p. 996.)

The record contains substantial evidence supporting the removal order in this case. First, the court took jurisdiction over A.C. and E.C. under section 300, subdivision (e) (child under age five who has suffered severe physical abuse by a parent). Given that we have rejected Mother's challenge to that jurisdictional finding, the finding constitutes prima facie evidence that the children could not safely remain in Mother's custody.

Second, regardless of that prima facie showing, more than enough evidence supports the court's finding that there were no reasonable means to protect the children short of removal. Mother relies on the statutory directive that the court must consider removing an offending parent from the home and argues that the court should have placed the children with her on the condition that Father live elsewhere.

But the record supports a reasonable inference that allowing Mother to retain custody and live separately from Father would not have sufficiently protected the children. Mother was also an offending parent and demonstrated a lack of protective capacity. She consistently denied that Father had abused the children. She said that she knew he did not hurt them, and she believed that they were safe in his care. She also suggested that law enforcement was lying about Father's admission that he had dropped

23

E.C., despite the video evidence of the interview. While she stated that she was willing to live separately from Father, both parents said that they intended to remain in a relationship. Mother in particular said that she wanted the family to stay together. And there was evidence that Mother was planning to flee the country with the children. All of that evidence gave rise to a reasonable inference that placement with Mother was not a reasonable means to protect the children.

Moreover, placement in Mother's custody under CFS's supervision would have required Mother to cooperate fully with the agency, and Mother did not fully cooperate with CFS. She was hostile with the social worker, accusing the worker of lying and bias. She refused to abide by visitation rules for bringing family members and invited roughly 30 people to one visit in particular. In connection with that same visit, she arrived two hours early and was hostile with security and office staff, who would not let her enter early. And she refused to sign a supervised visitation agreement with respect to Ei.C., so she was never allowed to visit that child.

Mother also makes a conclusory argument that because she engaged in predisposition services and visits, reunification was in the children's best interests. She does not otherwise challenge the court's order denying her reunification services.

The court here bypassed reunification services under three different provisions. (§ 361.5, subd. (b)(5)-(7).) Under two of those provisions, bypass was mandatory unless the court made a countervailing factual finding, by clear and convincing evidence, that reunification was in the children's best interests. (§ 361.5, subds. (b)(6), (7), (c)(2); *In re*

24

*A.E.* (2019) 38 Cal.App.5th 1124, 1141.) Under the third provision, bypass was mandatory unless the court made a countervailing factual finding that (1) reunification services were likely to prevent reabuse or (2) failure to try reunification would be detrimental to the children because they were closely and positively attached to Mother. (§ 361.5, subds. (b)(5), (c)(3).)

The parents bear the burden of proving those countervailing factual findings. (*In re Raul V.* (2022) 82 Cal.App.5th 290, 300.) When a parent argues that the juvenile court erred by failing to make the countervailing factual finding, we ask "'whether the evidence compels a finding in favor of the appellant as a matter of law,' that is, whether the evidence supporting [the parent's] position 'was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Id.* at p. 301.)

We are not persuaded by Mother's conclusory statement that it was in the children's best interests to reunify with her. She does not address the court's application of the bypass provisions or show how the evidence compelled a finding in her favor as a matter of law. We have no duty to develop those arguments for her. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) Mother thus forfeited the argument.

For all of these reasons, we conclude that substantial evidence supports the court's removal order.

25

III. *Visitation Order*

Mother argues that the record does not contain substantial evidence to support the court's finding that visitation would be detrimental to the children. The argument is unavailing.

Once the court bypasses reunification services, the court has discretion to permit visitation. (§ 361.5, subd. (f); *In re J.N.* (2006) 138 Cal.App.4th 450, 458, 460.) The court may look to the best interests of the child in exercising its discretion to permit or deny visitation. (*In re J.N.*, *supra*, at p. 459.) But if the court finds that visitation would be detrimental to the child after bypassing reunification services, then the court must deny visitation. (§ 361.5, subd. (f); *In re J.N.*, at p. 458.) We review the court's detriment finding for substantial evidence. (*In re Daniel C.H.* (1990) 220 Cal.App.3d 814, 838.)

The court bypassed reunification services and thus had discretion to deny Mother visitation even in the absence of a detriment finding. (*In re J.N.*, *supra*, 138 Cal.App.4th at p. 460.) Assuming that there is not substantial evidence to support the detriment finding, Mother does not explain how the court nevertheless abused its discretion by denying visitation. Her challenge to the visitation order fails for that reason.

In any event, substantial evidence supports the court's detriment finding. The children's caregiver reported that visits were adversely impacting A.A. He became anxious, emotional, and moody when visits approached. The child told the caregiver that he felt bad about visits and did not want to go, and he was worried that the parents would

26

take him home.  Similarly, A.A. told the social worker that he worried and felt sad about visits.  The evidence thus showed that visits were detrimental to A.A.'s emotional well-being.

Moreover, Mother's conduct demonstrated that she was not sufficiently protective of the children's safety and emotional well-being at visits.  She refused to agree to the terms of supervised visitation with Ei.C., so CFS did not permit her to visit that child.  She did not abide by the terms of visitation with the other children when she invited roughly 30 people to a visit.  During that visit, a maternal aunt upset A.A. by promising that he would be living with her soon.  At the same visit, E.C. appeared to be afraid of the large crowd and loud music that Mother was playing.  And at other visits, Mother asked A.A. to decorate a sign for Father's birthday and showed him pictures of Ei.C. with Father.  A.A. "shut down" after Mother asked him to decorate the sign for Father.  Mother did not appear to recognize how her attempts to involve Father, the perpetrator of abuse, affected A.A. That was consistent with her continued refusal to acknowledge that Father had harmed the children.  Mother also tried to give A.A. a cell phone with the location tracking enabled.  The court could reasonably infer from that attempt that visitation was detrimental to the children's safety, in view of the evidence that Mother was contemplating fleeing with the children.

For these reasons, we reject Mother's challenge to the visitation order.

IV. *Preferential Consideration of Relatives' Requests for Placement*

Mother lastly argues that the court and CFS erred by failing to give preferential consideration to relatives' requests for placement. The argument lacks merit.

When the juvenile court removes children from their parents' custody under section 361, the court must give "preferential consideration . . . to a request by a relative" for placement of the children. (§ 361.3, subd. (a).) "'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) Thus, section 361.3 does not establish a preference in favor of placement with relatives. It merely requires that the court and child welfare agency consider their requests first.

Mother fails to carry her burden of showing that the court and CFS prejudicially erred here. (*Red Mountain, LLC. v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 347 ["an appellant has the burden to show not only that the trial court erred but also that the error was prejudicial"].) She does not identify which relatives are at issue, much less show that the agency and the court failed to consider those relatives for placement before considering placement with nonrelatives. Likewise, she does not explain how she was prejudiced by the claimed failure to consider the unidentified relatives first. That is, she does not show that in the absence of the claimed error, a more favorable result was reasonably probable. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) For instance, the court and CFS must consider a host of factors in determining whether placement with a relative is appropriate. (§ 361.3, subd. (a)(1)-(8).) Mother does not

28

address those factors and argue that in the absence of error, the factors would have weighed in favor of placement with the unidentified relatives.  As already explained, we are not bound to develop Mother's arguments for her.  She therefore fails to establish prejudicial error with respect to relatives' requests for placement.

## DISPOSITION

The writ petition is denied, and the request for a stay is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ_____
J.


We concur:

McKINSTER_____
          Acting P. J.
MILLER_____
          J.